Statement of the case.

## LULA HIBBETTE ET AL. *v.* GEORGE W. BAINES.[*]

1. PARENT AND CHILD. *Custody of infant. Right of father.*

    On *habeas corpus* by a father for his children, in the custody of collateral relatives, it will be presumed to be for the best interests of the children to be with their father, unless his unfitness or abandonment of the children be shown.

2. SAME. *Disposition of child by mother. Assent of father. Contract. Public policy.*

    Where a mother on her deathbed, in the presence of and with the consent of her husband, gave the custody of her children to her mother for life, and, after her death, of her boy to one aunt and of her girl to another aunt. such disposition of the children, as a contract, was against public policy and void.

3. SAME. *Abandonment. Right of father. Interests of child. Case.*

    Where children had, under such an arrangement, remained with their grandmother for ten years, during which time their father contributed in a considerable degree to their needs and visited them several times a year, it cannot be said, on his claiming custody of them at the death of their grandmother, that he had abandoned them in favor of their aunts, and they should be awarded to him where it appears they are more liable to be separated by remaining with the aunts, and he is of good moral character and good financial condition and prospects.

4. SAME. *Preference of infants.*

    The action of a trial court in refusing, in *habeas corpus* proceedings, to assent to the preference expressed to it by children, aged ten and thirteen years, of remaining with their maternal aunts rather than of going with their father, will not be disturbed on appeal.

FROM the circuit court of Attala county.

HON. W. F. STEVENS, Judge.

Baines, the appellee, was the petitioner or plaintiff in the court below; Mrs. Hibbette and others were defendants there.

---

[*]Judge Calhoon being disqualified by reason of having been of counsel, Hon. Frank Johnston was appointed special judge in his place.

The opinion states the facts of the case, which was a proceeding by *habeas corpus* for the custody of petitioner's children.

*A. A. Armistead, Green & Green,* and *S. S. Calhoon,* for appellants.

Where are the happiness and welfare of the children? With their blood relations who have watched, cared for, trained, and educated them for years, and grown devotedly attached to them, and the children to their blood relations, who have known no other mothers; or with a bankrupt father, who has surrendered them for ten years, and a stranger stepmother who has expressed no desire to have them, and through whom all their comforts and advantages must come? If there was a contract with the appellants as to the custody of the children, acted on for ten years, the appellants are entitled to the custody of the children. The common law rule as to the right of the father to the custody of the children was repealed by the code of Mississippi, giving the chancellor the right to award their custody. *Cocke* v. *Hannum,* 39 Miss., 423; *Foster* v. *Alston,* 6 How. (Miss.), 461.

The father's right is not absolute. *McShan* v. *McShan,* 56 Miss., 413; 1 Parsons on Contracts, 310; Tyler on Infancy and Coverture, 275, 276, 283, 284; 2 Kent. Com., 195.

A voluntary contract to release infants to another is not revocable except for bad treatment. 9 Am. & Eng. Enc. L., 244–246; *Anderson* v. *Young,* 54 S. C., 388, s.c. 4 L. R. A., 277; 32 S. E., 448; 2 Kent. Com., 221, note *a.*

A voluntary placing of children by the father with grandparents (and aunts occupy the same attitude) continued, will not be disturbed. *Fullilove* v. *Banks,* 62 Miss., 11; Hurd on Habeas Corpus, 543, *et seq.; United States, ex rel. Schneider,* v. *Sauvage,* 91 Fed. Rep., 492; *Pool* v. *Gott* (Mass.), 14 Law. Rep., 269; Schouler on Dom. Rel. (5th ed.), sec. 251, note 4; *State* v. *Smith,* 6 Me., 462, s.c. 20 Am. Dec., Freeman's notes, 333–337; *Re Goodenough,* 19 Wis., 275; *Kelsey* v.

*Green*, 69 Conn., 291, s. c. 38 L. R. A., 471; 37 Atl., 679; *Sheers* v. *Stein*, 75 Wis., 44, s. c. 5 L. R. A., and notes; 43 N. W., 728; *Bently* v. *Terry*, 59 Ga., 555, s. c. 27 Am. Rep., 399; *Stringfellow* v. *Somerville*, 95 Va., 701, s. c. 40 L. R. A., 623; 29 S. E., 685; *Green* v. *Campbell*, 35 W. Va., 698, s. c. 14 S. E., 212; *Cunningham* v. *Barnes*, 37 W. Va., 746, s. c. 17 S. E., 308.

If there was no contract, the ten years' acquiescence in the custody of the children with appellants, as first placed by the father, by which the affections and attachments of the children have become engaged towards their adopted homes and their aunts, will prevent the father from disturbing their relations on account of the happiness of the children. Schouler on Dom. Rel. (5th edition), secs. 256, 248, 251; Tyler on Infancy and Coverture, 275, 276, 283, 284; *Hoxie* v. *Potter*, 16 R. I., 374; 17 Atl., 129; *Marshall* v. *Reams*, 32 Fla., 499; 14 So., 95.

In states which hold contracts to surrender children void, the contract will not be ignored, but will be looked to to determine the happiness of the child, and if, under such contract, the children have remained until their affections and attachments have been engaged towards their adopted home, the father will not be heard or permitted to disturb them. Tiffany on Dom. Rel., 249, 253, note 59; Church on Habeas Corpus, 724, 725, secs. 444, 447.

The children have chosen their home, and they are of sufficient mental capacity and age to choose. Mental capacity, and not age, is the criterion for them to choose. Hurd on Habeas Corpus, 536; *Cocke* v. *Hannum*, 39 Miss., 423; 9 Am. & Eng. Enc. L., 246; *Re Goodenough*, 19 Wis., 275.

Would the minor's condition be improved? If not, the writ should be refused. This is a correct principle. *Maples* v. *Maples*, 49 Miss., 393; *Cocke* v. *Hannum*, 39 Miss., 423; *Foster* v. *Alston*, 6 How. (Miss.), 406; *McShan* v. *McShan*, 56 Miss., 416.

Just as soon as Bains received the twenty-five and one-half

shares of Collier Drug Company stock from A. A. Armistead, which was the property of Rosa W. Bains, his little daughter, the dividend of which. he had been appropriating under the guise of "G. W. Bains, Agent," he at once transferred twenty shares of this same stock to his wife and took five and one-half to himself, which he can hold as exempt under the laws of the state of Alabama, thereby destroying her estate; and if he can gain her custody it will never be heard of again.    He is not entitled to her stock or any other of her property.    *Bedford* v. *Bedford*, 136 Ill., 354; 26 N. E., 662; Schouler on Dom. Rel., sec. 255.

A man who permits the custody of his infant child to pass, in accordance with his wife's will, to her sisters, and allows the child to remain with and be reared and trained by them for five or six years, though supported by a provision for the children made by the mother, will not be allowed to reassert his rights to the custody of the child if it is not for the welfare of the child.    *Stringfellow* v. *Somerville*, 95 Va., 701, s. c. 40 L. R. A., 623, s. c. 29 S. E., 685; *Kelsey* v. *Green*, 69 Conn., 291, s. c. 38 L. R. A., 471, s. c. 37 Atl., 679; *Sheers* v. *Stein*, 75 Wis., 44, s. c. 5 L. R. A., 781, and note, s. c. 43 N. W., 728; *Green* v. *Campbell*, 35 W. V., 698, s. c. 14 S. E., 212; *Cunningham* v. *Barnes*, 37 W. Va., 746, s. c. 17 S. E., 308; *Re Snook*, 54 Kan., 219, s. c. 38 Pac., 272; *Com., ex rel. Berkheimer*, v. *Berkheimer*, 4 Pa. Dist. Rep., 712; *United States, ex rel. Schneider*, v. *Sauvage*, 91 Fed. Rep., 492; *Brown's Estate*, 166 Pa., 253, s. c. 30 Atl., 1122; *Bently* v. *Terry*, 59 Ga., 555, s. c. 27 Am. Rep., 399.

The "unfitness" of the father in this kind of a case relates to the happiness of the child in his custody, and not to his personal character.    *Sheers* v. *Stein*, 75 Wis., 51, s. c. 5 L. R. A., 781, s. c. 43 N. W., 728.

In the following cases restoration of custody to the father after release or abandonment was denied.    *Verser* v. *Ford*, 37 Ark., 31; *United States* v. *Green*, 3 Mason, 482; Fed. Cas.

No. 15,256; *Warshaw* v. *Gimble*, 50 Ark., 355, s.c. 7 S. W., 389; *Marshall* v. *Reams*, 32 Fla., 499, s.c. 14 South., 95; *Smith* v. *Bragg*, 68 Ga., 652; *Bently* v. *Terry*, 59 Ga., 555, s.c. 27 Am. Rep., 399; *Janes* v. *Cleghorn*, 54 Ga., 9; *People, ex rel. Curley,* v. *Porter*, 23 Ill. App., 196; *Enders* v. *Enders*, 164 Pa., 266, s.c. 27 L. R. A., 56, and note, s.c. 30 Atl., 129; *Chapsky* v. *Wood*, 26 Kan., 650, s.c. 40 Am. Rep., 321; *Re Beckwith*, 43 Kan., 159, s.c. 23 Pac., 164; *Re Bullen*, 28 Kan., 781; *Ellis* v. *Jesup*, 11 Bush, 403; *State* v. *Smith*, 6 Me., 462, s.c. 20 Am. Dec., 333; *Com.* v. *Hammond*, 10 Pick., 274; *Curtis* v. *Curtis*, 5 Gray, 535; *Pool* v. *Gott* (Mass.), 14 L. Rep., 269; *Re Stockman*, 71 Mich., 180, s.c. 38 N. W., 876; *Corrie* v. *Corrie*, 42 Mich., 509, s.c. 4 N. W., 2131; *Weir* v. *Marley*, 99 Mo., 484, s.c. 6 L. R. A., 672, s.c. 12 S. W., 798; *McShan* v. *McShan*, 56 Miss., 513; *Foster* v. *Alston*, 6 How. (Miss.), 416; *Re Waldron*, 13 Johns., 418; *Re Murphy*, 12 How. Prac., 513; *People, ex rel. Johnson,* v. *Erbert*, 17 Abb. Prac., 395; *Spears* v. *Snell*, 74 N. C., 215; *Richards* v. *Collins*, 45 N. J. Eq., 287, s.c. 17 Atl., 831; *Sturtevant* v. *State, ex rel. Havens*, 15 Neb., 459, s.c. 8 Am. Rep., 349, s.c. 19 N. W., 617; *State, ex rel. Hodgden,* v. *Libbey*, 44 N. H., 324, s.c. 82 Am. Dec., 223; *State* v. *Barrett*, 45 N. H., 15; *Gishwiler* v. *Dodez*, 4 Ohio St., 617; *Clark* v. *Bayer*, 32 Ohio St., 299, s.c. 30 Am. Rep., 593; *Com., ex rel. Gilkeson,* v. *Gilkeson*, 1 Phila., 194; *De Hautville's case,* cited in 6 How. (Miss.), 460; *Hoxsie* v. *Potter*, 16 R. I., 374, s.c. 17 Atl., 129; *Jones* v. *Darnall*, 103 Ind., 569, s.c. 53 Am. Rep., 545, s.c. 2 N. E., 229; *Bryan* v. *Lyon*, 104 Ind., 227, s.c. 54 Am. Rep., 308, s.c. 3 N. E., 880; *Bonnett, ex rel. Newmeryer,* v. *Bonnett*, 61 Iowa, 199, s.c. 47 Am. Rep., 810, s.c. 16 N. W., 91; *Drumb* v. *Keen*, 47 Iowa, 435; *Ex parte Shumpert*, 6 Rich. L., 347; *Gardenhire* v. *Hinds*, 1 Head, 402; *Legate* v. *Legate*, 87 Tex., 252, s.c. 28 S. W., 281; *Coffee* v. *Black*, 82 Va., 567; *Stringfellow* v. *Somerville*, 95 Va., 707, s.c. 40 L. R. A., 623, s.c. 29 S. E., 685; *Merrit* v. *Swimley*, 82 Va., 439; *Green* v.

*Campbell*, 35 W. Va., 699, s.c. 14 S. E., 212; *Cunningham* v. *Barnes*, 37 W. Va., 746, s.c. 17 S. E., 308; *Sheers* v. *Stein*, 75 Wis., 51, s.c. 5 L. R. A., 781, s.c. 43 N. W., 728.

*Noel & Pepper*, for appellee.

An infant has no controlling legal right of election as to its custody. It was never designed to subject the legal right of custody to the caprice of infant children, nor to emancipate them from the rightful custody. Hurd, Habeas Corpus, ch. 8, 531; *Moore* v. *Christian*, 56 Miss., 408; 31 Am. Rep., 375.

Contracts for the disposal of children are not binding, being void as against public policy, according to the overwhelming weight of modern authority. Schouler, Dom. Rel. (last ed.), sec. 251; Church, Habeas Corpus, sec. 444; 17 Am. & Eng. Enc. L., 373. The father is the natural guardian of his infant children, and in the absence of good and sufficient reasons shown to the court, such as ill usage, grossly immoral principles or habits, want of ability, etc., is entitled to their custody, care and education. *People, ex rel. Nickerson*, 19 Wend., 16; 16 Schouler, Dom. Rel. (5th ed.), secs. 245–251; *Maples* v. *Maples*, 49 Miss., 393; *Moore* v. *Christian*, 56 Miss., 408; 31 Am. Rep., 375. The findings of the circuit judge in this case are entitled to the same considerations and weight as the findings of fact of the lower court in any other class of cases. *Kuhn* v. *Breen*, 101 Iowa, 667, s.c. 70 N. W., 722; *Shaw* v. *Nachtwey*, 43 Iowa, 653; *Drumb* v. *Keen*, 47 Iowa, 435; *Bonnett, ex rel. Newmeyer*, v. *Bonnett*, 61 Iowa, 199, s.c. 47 Am. Rep., 810, s.c. 16 N. W., 91; *Franklin* v. *Carswell*, 103 Ga., 553, s.c. 29 S. E., 476; *Re Knowack*, 158 N. Y., 582, s.c. 44 L. R. A., 699, s.c. 63 N. E., 676.

*Sweatman, Trotter & Knox*, on the same side.

The law presumes the child's interest to be in the custody of its father. *Weir* v. *Marley*, 99 Mo., 484, s.c. 6 L. R. A., 672, s.c. 12 S. W., 798. Whilst the children's desire will be heard and

weighed, it will not determine.    *Moore* v. *Christian*, 56 Miss.,
408, s.c. 31 Am. Rep., 375; Hurd, Habeas Corpus, 531 *et seq.*

Nature gives to parents that right to the custody of their
children which the law merely recognizes and enforces.  It is
scarcely less sacred than the right of life and liberty, and can
never be denied save by showing the bad character of the par-
ent or some exceptional circumstances which render its enforce-
ment inimical to the best interests of the child.    *Moore* v.
*Christian,* 56 Miss., 408–410, s.c. 31 Am. Rep., 375; *Foster* v.
*Alston,* 6 How. (Miss.), 406; *Re Knowack,* 158 N. Y., 482,
s.c. 44 L. R. A., 699, c.s. 53 N. E., 676; *Weir* v. *Marley,* 99
Mo., 484, s.c. 6 L. R. A., 672, s.c. 12 S. W., 798.

*Stirling & Harris,* on the same side.

The basis of the common law, as well as the statutory writ
of *habeas corpus,* is an illegal restraint, and this fact must be
admitted or proved to exist to warrant any further proceedings
on the writ.    But illegal restraint has a wider scope of mean-
ing in this class of cases than it had in the original design of
the use of the writ.    The term "imprisonment" (says Hurd)
usually imports a restraint contrary to the wishes of the pris-
oner, and the writ of *habeas corpus* was designed as a remedy
for him, to be invoked at his instance, to set him at liberty, not
to change his keeping.    But, in the case of infants, an un-
authorized absence from the legal custody has been treated, at
least for the purpose of allowing the writ to issue, as equiva-
lent to imprisonment, and the duty of returning to such cus-
tody as equivalent to a wish to be free.    Church on Habeas
Corpus, ch. Parent and Child, 423, 662; Hurd on Habeas Cor-
pus (2d ed.), 453.

While in doubtful cases the wishes of a child of this age will
be sought, and to some extent be observed, a boy of thirteen
cannot be allowed, at pleasure, to abandon his filial duties and
select elsewhere a home more agreeable either to his desires or
his worldly interests.    *Moore* v. *Christian,* 56 Miss., 408, s.c.

Opinion of the court.

31 Am. Rep., 375; *Lovell* v. *House of Good Shepherd*, 9 Wash., 419, s.c. 37 Pac., 660; *Re Neff*, 20 Wash., 652, s.c. 56 Pac., 383; *Miller* v. *Wallace*, 76 Ga., 483; *State, ex rel. Neider*, v. *Reuff*, 29 W. Va., 751, s.c. 28 E., 801; *Brooks* v. *Logan*, 112 Ind., 183, s.c. 13 N. E., 669; *Re Scarritt*, 76 Mo., 565, s.c. 43 Am. Rep., 768.

*Alexander & Alexander*, on the same side.

The law governing this case is well settled by our own decisions. It is not necessary to go elsewhere. If, however, we do look to the decisions of other states, great discrimination must be exercised, for many of the cases touching the custody of children are cases between husband and wife, or are in states which limit the remedy of *habeas corpus* to cases of illegal restraint of the liberty of the child. In a few of the states contracts by parents for the custody of their children are permitted by statute. In a few states such contracts are held binding in the absence of a statute. In cases where the remedy of *habeas corpus* is limited the wish of the child often controls. *Enders* v. *Enders*, 164 Pa., 266, s.c. 27 L. R. A., 56, s.c. 30 Atl., 129. The rule is that the contract is void. Whatever lack of regard for the natural rights of a parent appears in the decisions of other states, his paramount right is distinctly recognized in this state. *Moore* v. *Christian*, 56 Miss., 408, s.c. 31 Am. Rep., 375.

The absolute right of a worthy parent to his or her child is set out in a recent case in Tennessee. *State, ex rel. Bethell*, v. *Kilvington*, 100 Tenn., 227, s.c. 41 L. R. A., 286, s.c. 45 S. W., 433; *Prieto* v. *St. Alphonsus Convent of Mercy*, 52 La. Ann., 631, s.c. 47 L. R. A., 656, s.c. 27 So., 153.

Argued orally by *E. F. Noel* and *C. H. Alexander*, for appellant, and by *A. A. Armistead*, for appellees.

WHITFIELD, C. J., delivered the opinion of the court.

We are relieved of unnecessary fullness in stating the law

which must govern this case by the consideration that there is little or no difference between counsel as to what that law is, and none in the well-considered cases.    Undoubtedly, the father has primarily, by law as by nature, the right to the custody of his children.    This right is not given him solely for his own gratification, but because nature and the law ratifying nature assume that the author of their being feels for them a tenderness which will secure their happiness more certainly than any other tie on earth.    Because he is the father, the presumption naturally and legally is that he will.love them most, and care for them most wisely.    And, as a consequence of this, it is presumed to be for the real interest of the child that it should be in the custody of its father, as against collateral relatives, and he, therefore, who seeks to withhold the custody against the natural and legal presumption, has the burden of showing clearly that the father is an unsuitable person to have the custody of his child; or that, however moral a man he may be, he had abandoned his child, contributing nothing to its support, taking no interest in it, and permitting it to remain continuously in the custody of others, substituting such others in his own place so that they stand *in loco parentis* to the child, and continuing this condition of affairs for so long a time that the affections of the child and of the foster parents have become mutually engaged to the extent that a severance of this relationship would surely result in destroying the best interest of the child.    In such case as this the law, and it may well be said nature, too, denies to the father the custody of the child, but the denial is based not at all on any contract, but entirely and solely upon the situation as above stated, following the abandonment of the child by the father.    There is much loose talk in the books about the best interest of the child, and more as to the right of the father.    In the effort to escape from the arbitrary rule laid down by the common law as to the father's right, the danger is lest the pendulum swing too far, under modern decisions, the other way; and too much dis-

position is manifested in some cases to consult, not the permanent well-being of the child so much as its immediate enjoyment; to stand, not at the center of the whole circumference of the facts making up the life of the child from childhood to manhood or womanhood, but in that segment of those facts relating merely to what will make the child happy at the age he may be when the custody is determined. Parental authority and affection are not antagonistic to filial obedience and happiness. They are reciprocal and correlative.

Without more elaboration, we quote, to adopt as an accurate statement, the law announced in *Weir* v. *Marley*, 99 Mo., 494, s. c. 12 S. W., 798, 6 L. R. A., 672, a case cited by appellants' counsel: "In all civilized countries, in which the family is regarded as the unit of social organization, its minor members must and ought to be subject to the custody and control of those who are immediately responsible for their being, for the reason that by nature there has been implanted in the human heart those seeds of parental and filial affection that will assure to the infant care and protection in the years of its helplessness, to be returned to the parents again when they in their turn may need protection in their years of helplessness and of their child's strength and maturity. The law at the birth of an infant imposes upon the parent the duty of such care and protection, to the performance of which the instincts of nature so readily prompt, and clothes him with the right of custody, and that he may perform it effectually, upon the presumption that such custody, being in harmony with nature, is best for the interest not only of the parent and child, but also of society. Conceding, however, that the primary object is the interest of the child, the presumption of the law is that its interest is to be in the custody of its parent. The law has made provision in two instances whereby this presumption may be overcome, in the statutes providing for the adoption and apprenticing of children, when, for their interest, this right of custody is permitted to be transferred to another. In regard

to all other contracts by parents for the custody of their children this presumption may obtain; and while the parent may, by his inability or failure to discharge properly his duty towards his child, forfeit his right to its custody, because the interest of the child demands it, yet, upon the trial of an issue involving such a forfeiture, he is entitled to the benefit of such presumption, and, unless the interest of the child does demand it, such forfeiture cannot take place.   He cannot deprive himself of this right of custody, which is the concomitant of a personal trust imposed upon him by the law of nature as well as by positive law, and essential to the discharge of the duties of that trust, by contract *per se;* otherwise he might deprive his child and society of the benefits which the law contemplates will inure to each by the personal discharge of his parental duties.''

Such being the law applicable, let us examine each of the authorities cited by the appellants, analyzing carefully their facts.   It is the facts of a case which make the case, and the expressions published, then, in cases are to be interpreted, if we wish to reach correct results, strictly in the light of the very facts of each particular case.   What, then, are the cases upon which appellants' rely ?

In the case of *Sheers* v. *Stein,* 75 Wis., 44, s. c. 43 N. W., 728, 5 L. R. A., 781, the facts were that the respondent was the sister of the father, seeking to recover the custody of his daughter, about ten years old at the time of the application. This sister had nursed the child and its father through a dangerous illness, of which the mother had died, the child being then six months old, and, but for the aid of friends, the father and this infant daughter and a son, about five years old at that time, would have been dependent upon charity for support. The father never exhibited any affection for his daughter, though living in the family of his sister with her for three years, but avoided her, having very little to say to or to do with her.   In 1886 the father married again, and moved to

Nebraska.   Neither he nor this wife had any affection for the child.   The father never contributed anything for the support of the child, manifested aversion to it, and said he was not its father.   The supreme court counted strongly on this last fact, saying (page 53, 75 Wis., page 731, 43 N. E., and page 784, 5 L. R. A.): "After the death of his wife, the mother of the child, he expressed to his brother the horrible belief or suspicion, that his dead wife in her lifetime had played the harlot, and that he was not the father of the child."

In the case of *Verser* v. *Ford,* 37 Ark., 27, the facts were that the father had placed his infant daughter, at her birth, in the care of her grandmother and grandfather, the mother dying. The grandparents had kept the child for three years.   It was very delicate in health.   They understood its physical constitution, having nursed it.   The father, marrying again, sought to recover the custody when the infant was only three years old. The order was merely temporary, the court remarking that the father might apply again when the child was more advanced in years; but at that early age " the infant needed female care, which is better insured by the natural affection of a grandmother than the inexperienced efforts of a father or the sense of duty of the second wife."

The case of *United States* v. *Green,* 3 Mason, 482, Fed. Cas. No. 15,256, went off on a motion for an attachment against respondent because his answers were unsatisfactory.   The case was disposed of by consent decree.   It was a contract between father and grandfather as to the custody of an infant daughter, then attending a girl's college.   Judge Story very properly remarks " that the father's right is not absolute, but it is for the benefit of the infant, the law presuming it to be for its interest to be under the nurture and care of its natural protector, both for maintenance and education.   When, therefore, the court is asked to lend its aid to put the infant into the custody of the father, and to withdraw him from other persons, it will look

into all the circumstances, and ascertain whether it will be for the real, permanent interests of the infant.''

*Washaw* v. *Gimble*, 50 Ark., 351, 7 S. W., 389, was a contest to recover the custody of a boy four and one-half years old, brought by the father, from a man and wife not of kin, who had had its custody from birth, and is precisely like the case in 37 Ark., in the disposition of the case, the court simply saying that the order was temporary, and as the child advanced in years the father might apply for the child, but the application was premature.

*Marshall* v. *Reams*, 32 Fla., 499, s. c. 14 So., 95, was a contest between a humane master, to whom a boy sixteen years old had been apprenticed, and his uncle, to whom his mother intrusted his custody. The boy was an illegitimate child. He was sixteen years old at the time of the application, and expressed a strong preference against his uncle. The evidence showed that the uncle, in the language of the court, had inflicted ''immoderate and cruel punishment on the boy; had repeatedly whipped him—once with a switch three feet long; had compelled him to fish by dragging his seine in cold weather, in ragged clothes, and shoes with his feet sticking through; and that he had scars on his body from a whipping inflicted by his uncle.''

*Smith* v. *Bragg*, 68 Ga., 650, was a contest between a father, who had married again, and an aunt, for the custody of a boy nine years old, which boy the aunt had nursed at her breast, and always cared for, and which boy his mother and father had abandoned, contributing nothing to his support, and only seeking his custody when he got old enough to labor.

*Bentley* v. *Terry*, 59 Ga., 555, was a contest between the parents and a childless aunt over the custody of a girl then eight years old. Mrs. Terry, the childless aunt, took the child when it was about two years old, almost lifeless, nursed it into health, the parents contributing nothing to its support within the eight years. There was a contract there by the parents that Mrs. Terry should have it. Section 1793, Code of Georgia,

provides that " parental power is lost by voluntary contract releasing the right to a third party." The decision expressly rested on the ground that the statute makes such a contract valid. In the absence of such statute, such contracts for the transfer of children are universally held as against public policy, and we have no such statute.

*Janes* v. *Cleghorn*, 54 Ga., 9, is precisely like the case just analyzed, in that the decision rested expressly on the contract for the custody of the child, which the court held was valid under the Georgia code, and was not revocable. The child was only three years old when the application was made, and the court animadverts severely upon some sharp practice by which Cleghorn kidnaped the child from the custody of Mrs. Janes and her husband, who had no children.

In *Chapsky* v. *Wood*, 26 Kan., 650, the child was a girl only five and a half years old at the time of the trial, still in the period of helpless infancy. The court rested its decision upon this fact, and on the nature of the father, saying of him " that there was a coldness, a lack of energy, and a shiftlessness of disposition which made him an unfit guardian for a warm-hearted child to develop under, and upon the significant fact that the father had not married again, and the child was the child of a disowned daughter-in-law and sister-in-law, and could not expect, therefore, from the aunt and grandmother the sympathy such a child needed."

In *Re Beckwith*, 43 Kan., 159, s. c. 23 Pac., 164, the father was a drayman and a poor man, living in a rented house, intemperate in his habits, even using vulgar and profane language in his family, and the mother had gone to a son with the boy, the subject of the suit, and died there, requesting the son not to let his brother go back to the father. The father had with him one son and one daughter, both nearly of age, and the daughter declared her intention of leaving her father as soon as she got of age, and going to her brother, with whom two of his sisters were already living. It is perfectly obvious that

the father's house was a storm center, from which all the children fled as soon as they could, and that he was wholly unfit for the custody of the child.

. In the case of *Ellis* v. *Jesup*, 11 Bush, 405, the contest was between the father and the sister-in-law, to whom the girl, then thirteen years of age, had been given when she was about two years of age, and with whom she had remained during all that period, the father never having contributed one cent to her support, and visiting her very rarely, though living in an adjacent county, only ten or twelve miles away from his sister-in-law. She and her husband were childless, and in every way were competent to give the child an excellent home and education. It also appears that the child had inherited some property, which, it would seem, the father was endeavoring to get control of, as it seems, by certain extraordinary proceedings set out in the suit, having for their object the removal of her guardian from office, and the child herself to a distant state. Besides, the child was over thirteen years of age, very intelligent, and protested against any change.

In the case of *Com.* v. *Hammond*, 10 Pick., 274, the court refused to decide upon the relative rights of a mother and a grandmother· as to the custody of an eleven-year-old girl, on the ground that the liberty of the child was not interfered with in any way, and it has no bearing on this case.

In the case of *Curtis* v. *Curtis*, 5 Gray, 535, the girl was then sixteen years of age, and the decision was rested upon two propositions, chiefly that she was old enough to judge for herself, and that the mother had lost. her rights by indenture, which estopped her. . It is further to be noticed that the court did not award the custody of the girl, but left her at large to go where she pleased. These two last cases are not in point under our law. *Moore* v. *Christian*, 56 Miss., 408.

In the case of *Lucile Stockman*, 71 Mich., 180, s. c. 38 N. W., 876, the contest was between parental and maternal grandparents over the custody of Lucile, who was nine years of age

at the time of the hearing. The maternal grandparents had had the custody of the child from the time she was seventeen months·old, wholly supporting, maintaining, and educating her. She had been a very sickly child, and it was shown that the father entertained great hatred towards his wife's parents; yet even in this case Judge Campbell dissents.

*Corrie* v. *Corrie*, 42 Mich., 509, s.c. 4 N. W., 213, was a contest between father and mother, who were living apart, for the custody of a daughter, Fanny, seven years of age at the time, and living with her mother in Detroit. The court found that the father was not a suitable person to have possession of his child, and denied his application upon that ground.

*Weir* v. *Marley*, 99 Mo., 484, s.c. 12 S. W. 798, 6 L. R. A., 672, and the *Scarritt case*, 76 Mo., 565, cited by counsel for appellants, are the strongest sort of cases for appellee.

In the *McShan case*, 56 Miss., 413, the father was attempting to recover the custody of two children of very tender years from the mother. He had deserted this mother in the state of Arkansas when one of these children was two and a half years old, and a few months before the birth of the other, taking with him all the money in the house, and leaving his wife a very small supply of provisions. She scrambled back to her father's house in Itawamba county, where they found a good home. He had contributed nothing to the support of these children in the meantime. One of the children, at the time of the application, was five years old, the other three. The court rested its decision in refusing to disturb the custody of the children with the mother on the fact of their very tender age and the father's cruel and inexcusable conduct in abandoning his wife and children when and where he did.

The Waldron case, 13 Johns., 417, like the two cases previously cited from Massachusetts, did not award the custody of the child, but simply held that her liberty was not restrained, she being with her mother and her grandfather, a man of wealth, all of whose property she was to inherit, and the father was

utterly insolvent, and incompetent to provide for the mother and child.

The case of Joseph Murphy, 12 How. Prac., 513, went off upon the notion entertained by the court that the father's gift of the child was legal under the statute of the state of New York at that time, the child being only nine years of age, and having spent all its life with an uncle and aunt, from whose custody he sought to take him.

In the case of *People* v. *Erbert*, 17 Abb. Prac., 395, the father had turned over his three children (on the death of his wife), aged eight, six, and. five years, to respondent, abundantly able to provide for them. The father failed to pay board· as agreed to, and the children were legally indentured to the respondent. The father sought to recover these children· after a second marriage. The court expressly decided the case.upon the ground that the father's testimony in the case was perjured, and that he could not be believed, and that he was utterly insolvent; that he was the keeper of a drinking saloon in Chicago, and that his second wife's conduct in possessing herself fraudulently and forcibly of one of the children, in defiance of the authority of the court, showed her unfitness.

In *Spears* v. *Snell*, 74 N. C., 215, the contest was between an uncle with whom the boy, then thirteen years old, had been all his life, and the stepfather. The uncle had been married for ten years, and had no children. The stepfather was a roving tenant cropper. The mother desired the child to remain with the uncle. The court expressly adverts to the fact that the stepfather was under no legal obligation to provide for the child, and that the mother wanted him to remain with the uncle.

In *Richards* v. *Collins*, 45 N. J. Eq., 286, s. c. 17 Atl., 831, the contest was between the parent and an uncle and aunt for the custody of a girl who was old enough to make a sensible choice as to which one she would go with. During all the years she had been with her uncle and aunt, the parents, either

through inability or indifference,. withdrew themselves from the child, and apparently contributed nothing to its support.

In *Sturdevant* v. *State*, 15 Neb., 459, s.c. 19 N. W., 617, the contest was between the father, twenty-three years old, and the grandparents, over the custody of an infant girl, just eight months old. The court very properly rested its decision on the age and sex of the child, expressly awarding custody to the grandparents "until such time as its age and condition would justify the father in assuming the custody."

In *State* v. *Libbey*, 44 N. H., 324, the contest was between the father and the grandparents for the custody of a child then six and a half years old, which had been left with the grandparents four and a half years, and the court held that, as the father and stepmother were suitable persons, the custody should be awarded to the father. It is a strong case for appellee. This case also shows that *Pool* v. *Gott*, 14 Law Rep., 269, was a case where a child had been given at its birth to grandparents, who kept the child for fourteen years, wholly at their expense, the father contributing nothing, and taking no interest in the child.

The case of *State* v. *Barrett*, 45 N. H., 15, holds the unsound doctrine, now almost universally repudiated, that a contract for the transfer of the child by the father binds the father. Such contracts are manifestly void as against public policy.

The case of *Gishwiler* v. *Dodez*, 4 Ohio St., 615, was a contest between a father on one hand and the mother and another woman, who was a fortune teller, and her husband, who was a man of unsound mind, over the custody of an infant daughter four and a half years old. Father and mother were living apart by reason of the wife's fault. The wife was a drunkard, profane in her language, a notorious liar, had taught the little girl to swear, and was of very ungovernable temper. It certainly needs no argument to show that the father should have had the child.

The case of *Clark* v. *Bayer*, 32 Ohio St., 299, was a contest

between worthless parents, not able to provide for their children, both under five years of age, and their grandparents, to whom they had been surrendered by contract, and who had them for about a year, when they were kidnaped by the parents, who concealed one in Columbus, Ohio, and one in Cleveland, Ohio, and both were abused and mistreated and made feeble and sick by their custodians.    In an action by the grandparents to recover $5,000 damages, the court held that the contract was valid, and that the grandparents had a right to sue.

In *Com.* v. *Gilkeson*, 1 Phila., 194, the girl was fifteen years of age, and had been transferred by father and mother, under contract, to the custody of an aunt and uncle, the aunt and uncle agreeing to adopt her as their child.    The court held the contract valid as against the father and mother, and the judgment was simply that the girl should be discharged from restraint and left to go where she pleased.

In *Hoxsie* v. *Potter*, 16 R. I., 374, s.c. 17 Atl., 129, an indigent widowed mother put her infant child in the care of her deceased husband's sister at the age of three months, and left it with her for nine years.    The mother had three other children whom she parceled out among her relatives.    She then worked for her own support for four years, when she married Mr. Hoxsie.    Then she brought suit for this infant.    The child received no support whatever from her during these nine years, the mother never having seen the child but once in the nine years.    The court in this case found that the mother did not give the child absolutely, but only until she could care for it herself, and under these circumstances the extent of the judgment was that the child should remain with its aunt until a change might make it proper to award the custody to the mother.    The judgment was only temporary.

In *Jones* v. *Darnall*, 103 Ind., 569, s.c. 2 N. E., 229, the boy was of very tender years at the time of the application by the father to recover his custody from the maternal grand-

parents. It appeared that the father had no wife or home, worked by the month, went from place to place, and had no way to take care of the child, and since the death of his wife had been very often drunk, and had a· violent temper. The court awarded the custody to the grandparents, to remain there, in the language of the court, ''during the tender years of infancy at least.''

In *Bryan* v. *Lyon*, 104 Ind., 227, s. c. 3 N. E., 880, the contest was between father and two uncles over the custody of a boy ten years old and a girl eight years old. The mother of the children had been divorced from the father because he wholly failed to provide the necessaries of life, was utterly worthless, and wholly unsuited for the care of the children, and the court awarded the custody to the uncles, as against him, on this ground. During the six years after the divorce until the death of the wife he never once came to see the children, and never contributed one cent at any time, except $75 in the year 1881. He married a second wife, by whom he had another child, who was also with its maternal relations. He had no home of his own, and the court put its decision expressly upon his unfitness for their custody.

In *Bonnett* v. *Bonnett*, 61 Iowa, 199, s. c. 16 N. W., 91, the contest was between the mother and the stepfather and the grandparents for the custody of an infant daughter of four years of age, who had been with her grandparents most of the time since her birth. There was a contract in this case for the transfer of the child, and the court held it valid, and put its decision on that ground, and that the stepfather was under no legal obligation to support the child, and that the birth of children to the mother and stepfather would create new obligations; but the chief ground was the alleged validity of the contract.

In the case of *Drumb* v. *Keen*, 47 Iowa, 435, the contest was between the father and the grandparents for a boy five years old at the time. The father lived in the Indian Territory, had no person to care for the child except an Indian or negro

woman, and the grandparents had taken care of it from its birth under the claim of a contract for the custody of the child. The court held the contract valid in the sense the father meant it, not meaning to turn the child over to the grandparents permanently, but distinctly held that the judgment of the court below awarding custody to the grandparents should be modified so as to leave the father open to apply for his custody when he should have reached maturer years.

In the case of *Ex parte Schumpert*, 6 Rich. L., 344, the wife was compelled to leave her husband's home and go to her father's roof, taking with her an infant daughter, four years of age at the time of the last application by the husband. He had made two previous applications, when the child was about one year old and when about two years old. The court rested its decision upon the age and sex of the child, allowing the mother so keep it, and upon the unwarranted conduct of the father in forcing his wife from home.

In the case of *Ingram* v. *Smith*, 1 Head, 410, it appears that the child was a female, frail and unhealthy, only eight years old, and had been principally reared by her grandmother, in every way able to care for her. The father had neither home nor property.

The case of *Legate* v. *Legate*, 87 Texas, 248, s.c. 28 S. W., 281, was a contest over the custody of a little girl only two years old at the time, who had been placed with its foster parents since it was three months old. The court held that a contract for the custody of the child is not void, but did not decide to whom the custody of the child in the case should be awarded, the court answering merely questions certified to it.

In the case of *Stringfellow* v. *Somerville*, 95 Va., 701, s.c. 29 S. E., 685, 40 L. R. A., 623, the child was a girl, six years old, placed in the custody of aunts by the will of the mother, acquiesced in by the father. The court, at pages 706, 707, 95 Va. (page 687, 29 S. E., and page 625, 40 L. R. A.), shows that the decision was put upon the immorality of the father and

the perfect fitness of the aunts, and the tender age of the child, and leave was expressly given in the judgment for the father to apply again if change of circumstances warranted it.

*Green* v. *Campbell*, 35 W. Va., 698, s.c. 14 S. E., 212, is a contest, on the one hand, between the father and stepmother and the grandparents for the custody of a boy five years old. The decision expressly rested on the ground that a contract for the custody of the child was valid.

In *Re Goodenough*, 19 Wis., 274, a little girl had been placed, at six years of age, with foster parents, and she had stayed there six years, the home being in every respect all it ought to be, and at the time she was placed there she and her mother were inmates of the county poorhouse, and the father a convict in the state prison, and there was no evidence to show that there had been any change in him morally or that he was pecuniarily fitted to care for his child, and it was on this last ground expressly that the case went off.

In *Cunningham* v. *Barnes*, 37 W. Va., 756, s.c. 17 S. E., 308, the contest was over a child seven years of age, whose custody had been given by contract to the grandparents by the dying mother. These grandparents had wholly supported the child, the father contributing nothing. The father was shown to be immoral, high-tempered, without property. The court expressly held (pages 754, 755, 37 W. Va.; page 312, 17 S. E.) that the contract was valid, and rested its decision on that ground and upon the unfitness of the father. The stepmother in this case had made the father promise not to bring the child to her home, to which the court also refers.

The case of *Fullilove* v. *Banks*, 62 Miss., 11, was expressly decided upon the ground that the mother should not recover the custody of her illegitimate child from its alleged grandmother, because the mother was a common prostitute.

In the case of *Com.* v. *Addicks*, 5 Bin., 520, the father of two female children, aged respectively seven and ten years, was endeavoring to recover their custody from his former

wife, from whom he had been divorced on the ground of her adultery with the man with whom she was then living, and with whom she had gone through a form of marriage. The court at that time, on account of their tender years, as the court said, left these girls with their mother. Three years later, in *Same* v. *Same*, 2 Serg. & R., 174, the same court, doubtless having discovered its error, delivered these children to their father.

What, now, are the facts of this particular case? A great and largely controlling fact is that the father is just as suitable a person, morally, financially and socially, to have the custody of these children as the appellants. The finding of that fact makes it absolutely necessary that the evidence shall show clearly an abandonment by the father of his children, operating in law as a forfeiture of his natural and legal right to their custody. Addressing the facts in this record to the solution of that inquiry, is there any such abandonment shown in this case? When the wife died the father was prosperous, owned his home and a partnership in four different drug stores. He never claimed anything from the Armistead estate, the income from which was about $400 per year, and in which his wife owned a one-sixth share. After his wife died, leaving the children—a boy, a mere infant, about four months old, and a girl about three years old—with their grandmother, the father went to Birmingham, Ala. He sustained, in common with a great many others about that time, great loss, as a consequence of which he was forced to take the benefit of the bankrupt law. Struggling on, he has succeeded in regaining his financial footing, has married a woman of large means and excellent character, who has built in Birmingham a new and elegant home. This lady, a widow when he married her, has always been childless, having no children by her present husband to divide her affection, though she has been married to her present husband since June, 1895. At the time of the death of the mother, Mrs. Hibbette and Mrs. Land were young ladies,

about sixteen and seventeen years of age, respectively. The mother died at her mother's home, in Vaiden. In 1894 Mrs. Armistead, the grandmother, moved from Vaiden to Kosciusko, making that her home until the time of her death, November 25, 1899, after which the present suit was brought. A previous *habeas corpus*, brought a few weeks prior to the grandmother's death, was dismissed after her death. This first suit, though brought in the lifetime of the grandmother, we think is shown to have been brought by reason of certain adoption and guardianship proceedings. In the adoption proceeding, begun September 16, 1899, it was asked that the children be adopted by the grandmother for her life, and at her death that the two aunts should succeed to her rights. On the twentieth of September, 1899, the petition for guardianship was filed, which alleged appellee to be morally and socially unfit to have the custody of his children, and on the same day a decree was entered adjudging him morally and socially unfit to have his children, and the appellee states that he knew nothing of any of these proceedings until October 15, 1899, and then learned of them accidentally. It should here be stated that Miss Willie Armistead, on October 21, 1896, married Mr. John Land, of Shreveport, La., and went to Shreveport to live. On October 26, 1897, about a year later, Miss Lula Armistead married Mr. Eugene Hibbette, of Shreveport, and also went to that place to live, the residences of the two sisters adjoining and being in the same inclosure. After the marriage of her daughters, the grandmother for several years visited Shreveport on the invitation of Mr. Land, taking the children with her, remaining during the scholastic year only, returning with the children in the summer to her home and their home in Kosciusko. It is perfectly obvious that up to the death of the grandmother, two years after marriage of one daughter and three years after the marriage of the other, these children had been in the exclusive custody of their grandmother. During Christmas, 1898, Mr. Baines and his present wife paid a

visit to the children at Shreveport, La., and during this visit
it is evident that the fact that Mr. Baines expected to reclaim
his children after the grandmother's death begot trouble, as
appears from the letters of Mrs. Armistead, the grandmother,
of August 10, 1899, from Shreveport, and of A. A. Armis-
tead, of August 21, 1899, from Kosciusko, and of Mrs. Armis-
tead, from Shreveport, July 3, 1899, especially, and a letter
of J. R. Land of August 21, 1899, from Shreveport.   A letter
from Mr. Baines from Birmingham, December 8, 1897, to Mrs.
Land, shows, we think conclusively, that it was his purpose to
reclaim the children only after Mrs. Armistead's death.   He
says therein: "I will accept your proposition in regard to my
darling little ones for the present.   I make this sacrifice for
dear mamma's happiness.   She is growing old now, and will
soon be called to her home in heaven.   She has given to us the
best part of her pure life, 'and now we all take pleasure in
making her few remaining days as happy as we can; and, so
long as my little ones are necessary to her happiness, and not
burdensome by reason of the care that they are necessarily to
her, she can keep them." ' This being the state of the case in
the last of August, 1899, the grandmother returned to her
home in Kosciusko, with the children, on a telegram from her
son, Mr. Armistead, and soon after the adoption and guardian-
ship proceeding referred to took place.   It is obvious that the
grandmother's trips to Shreveport with the children were visits
for school purposes, the grandmother returning to her home
every season; that Mrs. Land was in Shreveport for about a
year before the children ever went there; that Rosa is staying
with the aunt to whom she was not given, and the boy with
Mrs. Hibbette.   The circumstances above set forth sufficiently
explain, we think, the bringing of the *habeas corpus* in the life-
time of the grandmother.

From the wife's death, in 1889, until July, 1891, the father
remitted monthly to Mrs. Armistead, for the children, twenty-
five dollars.   He failed in July, 1891, and sent for some

months ten dollars. It is shown, we think clearly, that Mr. Baines sent checks covering three thousand dollars, after July, 1891, and that he has spent at least five thousand dollars from the death of his wife until the bringing of this suit on his children. There is an effort to show that the twenty-five dollars per month were dividends from stock it is alleged the father assigned to Mr. A. A. Armistead in trust for Rosa. This, if true, does not alter the fact that the father at last was the source of the bounty—the principal—and that he constantly remitted, which is the important thing in this inquiry. This included not merely these monthly remittances, but the payment of many accounts for his children for drugs, clothing, etc. He never allowed a birthday of either child to go by without remembrances sent, and often did the like on holidays. In addition to this, he made frequent, and sometimes valuable, contributions to the grandmother and aunts; and, indeed, the relations all around, as evidenced by the letters in the record, were pleasant ones, up to the visit of appellee and his wife to Shreveport, during Christmas, 1898.

The present Mrs. Baines made some presents to the children, and she is shown by the testimony of two witnesses to have manifested for them affection and tenderness and a desire to promote their happiness. What does the record show as to the state of feeling between the father and his children? The father came from Birmingham to see his children several times every year, except for one interval of two years, and was visited by his children at his home in Birmingham; and there was a regular correspondence kept up between him and the aunts and the grandmother, and letters were also regularly written or messages sent for the children to their father. These letters and messages on the part of the children breathe the tenderest affection. They call him "Darling Pops" and anticipated his visits with greatest pleasure. On his part his letters show the deepest and most constant affection and solicitude. We do not think the expression on the part of these children of a prefer-

ence to remain with their aunts, made in the court below to the judge, entitled, under all the circumstances of this case, to much consideration. The trial judge was in far better situation to judge as to this particular point, seeing and hearing the children themselves, than we are, reviewing the cold page unillumined by the manner and actions of the children at the time. The whole environments, all the history of the case, as well as the ages of the children, and the unlikelihood of their competency at so early an age to make a choice wise for all the years to come, are factors entering materially into the solution of this question. The child speaking out its choice of a custodian at ten or thirteen selects with reference alone to the continued furnishing of those things which make up happiness and joy for those ages. The horizon which bounds the child of ten or thirteen is not the horizon the whole perspective of which is necessary to take into view in determining who shall have the training and character building of children. The vision of the little ones of ten and thirteen sees nothing beyond the horizon bounding those years. They cannot balance the advantages and disadvantages of different custodians, so as to correctly determine which one will guide it best, and fashion it most wisely into the make-up of perfect manhood and womanhood.

We have purposely left for the last the alleged contract in the adoption proceeding. It was prayed that the grandmother should have the children for her own during her life, and the aunts after her death. There is considerable conflict in the testimony as to what precisely did occur at the deathbed of the wife and mother. It was a scene of pathetic interest beyond power of words properly to describe. The very tenderness and silence and awful sanctity of that scene—the last interview between the husband and wife—would make it doubly hard for the husband to express any dissent, if he felt it, from her expressed wishes. The cold processes of reason, proper enough as tests of conduct in the ordinary transactions of life, are not the alembic by which to try the reasonableness of conduct in

the pain and passion of such an hour. If, however, we should accept the appellants' version that the mother made in the presence and with the assent of the father a contract whereby she gave the custody of the children to their grandmother for her life, and after her death the custody of Rosa to one aunt and Willie to the other, the aunts being then about sixteen and seventeen years of age respectively, it follows, as settled by law, that the whole contract was null and void, as against public policy. But more than this follows. As a matter of fact, it follows that the custody during the grandmother's life, from 1889 to November, 1899, was the exclusive custody, so far as the contract right is concerned of the grandmother. Indeed, the aunts, at sixteen and seventeen, were themselves of years too immature to constitute them custodians of the children; and this is not only the result of the contract, but it is actually what occurred, since one aunt lived for three years and the other two in Shreveport, La., the grandmother retaining exclusive custody of the children throughout that time. This is an exceedingly important result, both from the contract and from the facts in the case, in view of the fact that the appellants contend that they had had the custody and care of the children jointly with the grandmother during her life, and solely themselves after her death. It is obvious that this is not the fact. If it may be stated, in some necessary view, that the aunts cared for the children with the grandmother before their marriage, it yet remains true that for three years as to one and two years as to the other, after marriage, the grandmother exercised exclusive custody and control. It is patent that on the contract alone, if it had been valid, neither aunt could predicate any right while the grandmother lived. And so, if the right of the aunts is to be placed—as alone it could in any case be placed—upon the ground that they had stood, as a matter of fact, *in loco parentis* to these children from the death of the mother, and the other fact that the father, by his conduct, had abandoned them, and allowed the appel-

lants wholly to provide for them, and the relations of parental and filial strength to grow up between the children and aunts, then it is clear that the facts in this record show no such abandonment in the first place, and, in the second, there was a break of three and two years in the custody and care of the aunts. It will not do to say that merely because the aunts have nursed tenderly these children, and cared for them most affectionately for seven or ten years—seven of them in conjunction with the grandmother—and because, therefore, they have come to love the children as if they were their own, and the children them as if they were their parents, so that the severance of these relations would bring great grief to both, the aunts should retain the custody. It might well be, and, indeed, it is the case here, that, all this granted, there stands another figure on the scene—the father—who has most abundantly supplied their every want, who has kept up, by correspondence and by visits, the tie of filial and parental tenderness, who is conceded to be financially, socially, and morally as fit a custodian as the aunts, standing with arms opened, calling his children home, and whose heart must bleed, we must believe, as sorely as the aunts', if these children are kept from his bosom. It must be remembered that he has no other children; that his present wife is childless. It must also be remembered that one of the aunts has a child of her own, and that the other has only been married two years, and may have children of her own. If these children are awarded to their father, they not only return to their natural and legal protector, but they return to one home, where—a matter of vital importance to their happiness—they will have the companionship of each other until mature years shall come; the ties of brotherly and sisterly affection will be knit so that time cannot break them. On the contrary, it is but the accident of the situation that the aunts live now on adjoining lots within one inclosure. One husband earns as his salary as district attorney about $3,000 per year; the other about $1,500 per year. The present Mrs. Baines is worth over $30,000,

and Mr. Baines is earning a salary of about \$1,200 a year, has a few thousand dollars in money and other property, and owns some stock in the Collier Drug Company, of Birmingham, of which he is vice president.

In the changing scenes of life is it at all unreasonable to anticipate the time when these aunts may live in different homes, distant from each other, and if that time shall come, will not there be as cruel a severance of affection's ties between one aunt and the boy and the other aunt and the girl, and also between the brother and the sister ? Again, one of the aunts has children of her own, possibly also the other. There would then be two sets of children in each household. It is not natural that the same affection could exist between the aunts and these children which would exist between the mothers and their own children. Most obviously these gentlemen, Mr. Land and Mr. Hibbette, are entitled to the highest praise for their noble conduct in agreeing to take care of these children, and these aunts for their pure and unselfish love lavished upon them for years. But they are not legally bound for the maintenance and education of these children. If death should remove them—as it removes us all in time —where, then, would be the expectation of these children? Is it not clear that all they get from uncles and aunts while living is bounty merely, and that at the death of the uncles and aunts they cannot become their heirs if nearer kin be living? Shall these two children grow up with this sense of dependence embittering life? All this is wholly different under the father's roof. He is bound by the law of the land to maintain and educate these children. They become his heirs when he dies intestate. So far as this record discloses, they have so far experienced from the stepmother kindness alone. Every consideration would prompt her to continue that kindness. Love for the husband, if there were none for the children, would demand this, that there might be peace in the home. But the testimony is that she has manifested affection for them, evidenced by substantial tokens.

Once more, what is meant by the best interest of the child ? That which, in the whole view from the age at which the child is when the court is called on to decide to the years of majority, most surely will build into fine characters and make them fit for the successful discharge of the duties devolving upon them as man and woman; not that which merely gilds with rainbow hues the childhood sky. At the base of that character which is to make real happiness when the boy shall have become himself a man, perhaps a father, and the girl a woman, perhaps a mother, lies by immutable moral law the duty of obedience to parents, the necessity of subjection to the firm and kindly discipline of the household, where son and daughter render the honor and reverence and the obedience which make them the joy of their parents' home, and prepare them to expect the like when they shall become fathers and mothers. It was not omitted to be penned that he who had for his business the redemption of the world remained to maturest years "subject to his parents." If "duty" is the sublimest word in our language, we should take care that, along with happiness and pleasure, its varying obligations to father and to mother, to sister and brother, are thoroughly learned where God ordained them to be learned—in the play of household life from infancy to majority—so that, when it is correctly said that in inquiries like this the pole star is the best interest of the child, we have not solved the trouble until we have come to a sound comprehension of what the law embraces in the scope of that phrase, "the best interest of the child."

Summing up, then, our review of the facts touching the contract, two things seem to us clear: first, that, if the contract was as contended by appellants, they cannot claim any right under it, since it is utterly void; second, that, if you look at the contract as illumining the relations of the parties in connection with all the circumstances of the case, it is plain that the father has never abandoned these children or lost his right to reclaim their custody. The duty which has been placed

upon the court is an extremely embarrassing one, painful to the last degree. We could wish that all the asperities which have marked this litigation may be smoothed away and kindliness take the place of bitterness.

Pronouncing now the judgment of the law, after the most painstaking consideration of this case, we are constrained to
*Affirm the judgment of the learned court below.*