MAYFIELD *v.* BRAUND, et ux.

May 11, 1953

No. 38741      31 Adv. S. 33      64 So. 2d 713

*F. M. Belk, John B. Farese, B. P. Mauldin* and *Price & McIlwain,* for appellant.

*Kermit R. Cofer* and *Smith & Hurdle*, for appellees.

McGehee, C. J.

This is an adoption proceeding which originated in the Chancery Court of Marshall County, Mississippi, wherein the petitioners, Dr. R. R. Braund and wife of Memphis, Tennessee, are seeking to adopt as their children, with full right of inheritance, the three minor children of the appellant, James A. Mayfield, Jr., and of his former wife, Mrs. Elizabeth Biffle Mayfield, now deceased; and to change their names to Braund.

At the time of the filing of the petition on August 30, 1951, the three children, Bonnie Sue Mayfield, who was born on January 31, 1943, James Allison Mayfield, III, who was born January 19, 1945, and Nancy Brook Mayfield, who was born March 29, 1946, were residing with their maternal grandparents, Rev. and Mrs. J. A. Biffle, in Marshall County. On September 1, 1951, they voluntarily turned over to the petitioners, Dr. and Mrs. Braund, the care and custody of the children and consented to their being taken to Memphis, pending the hearing of the petition for adoption, in order that they could enter school during the early part of that month. The children have remained in the care and custody of Dr. and Mrs. Braund since that time.

The maternal grandfather, Rev. J. A. Biffle, joined the Braunds in the petition for the adoption of the children by them, and the three children also joined in the same by their said maternal grandfather, and the attorney for petitioners, as next friends. The appellant, James A. Mayfield, Jr., as the natural father of the children, was made defendant to the petition, and on November 12, 1951, he filed an answer and cross bill in the cause, denying such allegations of the petition as

were contrary to his defense, and asking under his cross bill that the care and the custody of his children be awarded to him, since their mother had died, as aforesaid, on July 11, 1951.

The petitioners alleged in their petition for adoption that the defendant, J. A. Mayfield, Jr., ''has abandoned and deserted said children, is morally unfit to rear and train them, and that, considering the welfare of the children, the granting of the prayer of this petition will best serve their interest.'' Such was made the issue under their pleadings, and such is the issue under our statutes and court decisions in a contest between a natural parent and collateral relatives or other persons. The cause was tried upon the theory, insofar as the trial judge was concerned, that the issue to be determined was ''what is to the best interest of the children.'' This would have been the sole issue if the contest for the care and custody of the children had been between their natural father and their natural mother, or had been a contest between collateral kindred or other third persons, but not so as between a natural parent and third persons whether related or unrelated by blood or marriage to the child or children involved.

The right to adopt a child or children did not exist at common law, and was first conferred by statute in this State under Section 525, Code of 1871, when the Legislature conferred upon the circuit courts the power, upon the petition of any person within their respective jurisdictions, to adopt any infant, and to change the name of such infant, where the petitioner ''shall state, in such petition, the name and age of such infant, and the names of the parents, or guardians, and their residence, if they be living, the name proposed to be given to such infant, *and that he has obtained the consent of the parents,* if living, or of the guardians, if any there be, and of the infant, if over fourteen years of age, *to the adoption and change of name,* as prayed for; and shall also state in said petition, what gifts, grants, bequests or benefits, he

proposes to make; or confer upon such infant; . . .''
(Italics ours.)

The foregoing statute was carried forward as Section 1496, Code of 1880, and then Section 1830 of that Code conferred upon the chancery court a concurrent jurisdiction in the premises to render a decree of adoption of a child under the same circumstances as the circuit courts were authorized to do. Section 492, Code of 1892, conferred such jurisdiction, under the same circumstances, upon the chancery court alone to entertain a petition for adoption. That section of the Code of 1892 was carried forward as Section 542, Code of 1906, and Section 299, Hemingway's Code of 1917, and Section 358, Code of 1930.

In the case of Roberts v. Cochran, 177 Miss. 546, 171 So. 6, (applying Section 358, Code of 1930) the Court held that the requirement of the statute to the effect that the petition for adoption should allege that the petitioner ''has obtained the consent of the parents, if living'' was jurisdictional, and that: ''The decisions of our court with reference to the custody of children have no application in an adoption proceeding. Although the father or mother may be unfit to have the custody of their child under our statute it cannot be adopted by another without the consent of both of them.''

The decision in Roberts v. Cochran, supra, was rendered on December 7, 1936, and thereafter the Legislature enacted Chapter 268, Laws of 1938, dispensing with the necessity of averring in the petition that the consent of the parents, if living, has been obtained, but the Legislature then added the provision: ''. . . But no infant shall be adopted to any person if either parent, after having been summoned to answer the petition for adoption, shall appear and object thereto before the making of a decree of adoption.

''Unless it shall be made to appear, from evidence touching such matters, that the parent so objecting has abandoned and/or deserted such infant, or is mentally

and/or morally unfit to rear and train it, *in either of which cases* the adoption may be decreed notwithstanding the objection of such parent, first considering the welfare of the child or children sought to be adopted.'' (Italics ours.)

The said Chapter 368, Laws of 1938, was carried forward as Section 1269, Code of 1942, and the only change now existing in this statute is reflected by Chapter 305, Laws of 1942, wherein there was made effectual any written authorization of the parents, or the survivor of them, ·designating some person or benevolent, charitable, or religious organization to appear and act for such parent in such adoption proceeding, and to consent on behalf of the parents, or the survivor of them, to the adoption of the child or children. But that statute also contains the same provision last above quoted from Chapter 268, Laws of 1938, and section 1269, Code of 1942.

Thus it will be seen that the Legislature of this State in providing the statutory method for the adoption of a child or children, has not empowered any court to adopt unto others a child or children where the parent ''shall appear and object thereto before the making of a decree of adoption,'' unless it shall be made to appear, from evidence touching such matters, that (1) the parent so objecting has abandoned or deserted such child or children, or (2) is mentally or morally unfit to rear and train the same, but that ''in either of which cases the adoption may be decreed notwithstanding the objection of such parent,'' provided, of course, as stated in the statute, the welfare of the child or children sought to be adopted would be best served by allowing the petitioners then before the court to do so. It is therefore made clear that the court does not reach the issue of what is to the best welfare of the child or children sought to be adopted until it shall first appear from the evidence that the parent so objecting has abandoned or deserted the child or children, or is mentally or morally unfit to rear and train it or them,

when the contest is between a natural parent and third persons.

In the instant case, the trial court entered its final decree on May 14, 1952, adopting to Dr. and Mrs. Braund the three children of the defendant, James A. Mayfield, Jr., changing their names to Braund as prayed for, and denying unto their father the relief sought under his cross bill, filed herein on November 12, 1951.

The trial judge, at the conclusion of all of the evidence, rendered a written opinion herein, in which there is contained no affirmative finding that the defendant, James A. Mayfield, Jr., had either abandoned or deserted the children, or either of them, or is mentally or morally unfit to rear and train them. In his written opinion, which contains about seven and one-half pages, reviewing the evidence and the law of the case, the chancellor interpreted Section 1269, Code of 1942, as declaring the first consideration to be the welfare of the child or children sought to be adopted, and stated therein that "this court is limited as to what is to the best interest of these children"; and he then directed that they be awarded to Dr. and Mrs. Braund under the proper adoption order, and that the judgment be drawn accordingly.

However, in the final decree entered in the cause, it was adjudicated that "the defendant, J. A. Mayfield, Jr., has, because of his moral unfitness and because of his abandonment and desertion of said minors, forfeited such right as he might otherwise have to their custody; * * *." The decree clearly indicates that the counsel who drew the same were cognizant of the necessity under the law of having such fact adjudicated, in accordance with the averments of the petition, and as to which the petitioners had the burden of proof.

The proof offered by the petitioners, and which was not controverted by the defendant, amply sustained the averments of the petition to the effect that they are proper and suitable persons to have the care, custody and training of the children involved; that they are the own-

ers of nice residential property in the suburbs of Memphis, consisting of five or more acres of land, a nice and spacious residence with ample room for the abode of these children and also for two children born of their own marriage; that the petitioner Dr. Braund has an income of from $20,000 to $25,000 per annum; that both Dr. and Mrs. Braund are active members of their church, are regular attendants thereof, and that their own two children, a daughter then sixteen years of age and a son fifteen, are likewise members of the church and are of good character and properly reared under Christian influences; that Dr. and Mrs. Braund, as well as their two children, are devoted to the three children involved in this litigation, and that these children are likewise devoted to all of the members of the Braund family. In other words, there is no question but that the Braunds are suitable people, morally, religiously and financially to give these children a comfortable home, a good education, and a Christian atmosphere for their proper training. These facts are amply established by creditable witnesses, and there is no disputed issue of fact in regard thereto.

Nevertheless, the fact remains that under Section 1269, Code of 1942, the adoption statute applicable to this proceeding, when the natural parent of the children involved appeared after having been summoned to answer the petition for adoption and objected thereto, it was incumbent upon the petitioners to meet the burden of proving that he had either abandoned or deserted the children, or was then mentally or morally unfit to rear and train them. In such a proceeding, there is no need for a petitioner to proceed with the case unless he is prepared to prove one or the other of the two foregoing grounds which are declared by the statute as a jurisdictional prerequisite to the right of adopting a child over the objection of its natural parent.

The facts bearing on the question of whether the defendant in the instant case had either abandoned or deserted his children or is mentally or morally unfit to rear

and train them are so interwoven that they should be stated in one narrative rather than in two separate ones.

In the outset, it may be stated that there is no contention made, and none could be successfully made, that the natural father is *mentally* unfit to rear and train the children, and we are therefore not concerned with that aspect of the statute involved.

The petitioners offered no proof to show that the defendant has been guilty of any immoral act or conduct involving moral turpitude during the entire period of six years immediately preceding the trial of this cause.

To show both abandonment of the children and the moral unfitness of the father to rear and train them, the petitioners rely upon the following state of facts to wit:

It was shown by documentary evidence that the father of the children was indicted in Monroe County, Mississippi, on October 25, 1943, for having taken at some unstated time prior thereto the sum of $6 from one Willie Montgomery, against the will of the latter, and by placing him in fear while exhibiting a pistol; that on November 1, 1943, the defendant withdrew his plea of not guilty to the indictment for this alleged crime and entered a plea of nolo contendre; that an order was thereupon entered by the court which recited that he had agreed to leave the First Judicial District of Mississippi and not return except upon written authority of the court; that the sentence for the alleged crime was deferred "until the court in term time or the judge in vacation may see fit to have said defendant brought before him and then and there impose same"; and that no sentence was imposed on the defendant until the 5th day of March, 1946, when he was sentenced to serve a term of ten years in the state penitentiary on the ground that he "has repeatedly returned to the said district without authority of the court, and on the 28th day of February, 1946, he was in the City of Amory, Mississippi, armed with a deadly weapon, to wit, a sawed off shotgun loaded with cut shells. * * *"

Thus, it does not clearly appear whether the ten-year sentence in the state penitentiary was imposed because of the seriousness of the offense alleged in the indictment which the defendant now claims was the result of a political feud or because of what he was alleged to have done in the City of Amory on the said 28th day of February, 1946. Nor does it appear that he made any threats or committed any overt act in connection with any violation of the law while in the City of Amory on the occasion of his appearance there, some two years and more after his sentence in connection with the alleged crime of robbery had been deferred.

At any rate, the defendant went to the state penitentiary to serve the ten-year sentence, became a "trusty" after he had been there about fifteen months, and made a model prisoner throughout the period of his incarceration and until he was paroled on October 25, 1950.

While in the penitentiary, the defendant attended religious services regularly according to the testimony of the chaplain, Rev. A. R. Beasley, and became a rehabilitated man.

During the defendant's confinement in the penitentiary, the mother of the children here involved filed a suit for divorce against him on November 18, 1947, on the ground that he had been sentenced to the penitentiary and had not been pardoned before being sent there. No complaint was made in that suit that the defendant had otherwise mistreated his wife or children. A decree was rendered on January 20, 1948, awarding unto the complainant, Mrs. Elizabeth Mayfield, the care and custody of the three children, and undertaking to award to them three-fourths of the undivided interest of the defendant in his father's estate, to be paid to the complainant at the rate of $20 per month for the support of the children until such interest was exhausted. However, it appears that prior to the filing of suit for divorce, the defendant had already assigned his interest in his father's estate, in

writing, to his sister, Mrs. Patricia Mayfield Mauldin, to be used by her in contributing to the support of Mrs. Mayfield and the children, the defendant then being in the penitentiary and having no other means of contributing to their support.

After the estate was finally closed, Mrs. Mauldin was able by virtue of such assignment to obtain the defendant's share of the proceeds of the sale of his father's farm and other assets, and she thereafter issued checks in favor of Mrs. Mayfield, aggregating the sum of $1,400, and which amount seems to represent the entire income of the defendant while he was in prison. The first of the checks sent by Mrs. Mauldin was for $60 and bears the notation ''Christmas gift for the three Mayfield children.''

It is complained on this appeal that these payments by Mrs. Mauldin for the support of the children did not begin until eleven months after the decree of divorce. However, the burden was on the petitioners to show that the failure of the defendant to have his share in his father's estate paid over to Mrs. Mayfield for the support of the children at an earlier date than he did was due to some fault of his own. Prior to the filing of the divorce suit, he had written Mrs. Mauldin to come to Parchman where he was incarcerated, and he then executed the written assignment to her for the purpose aforesaid, and insofar as the record shows he had no control of the matter of when a final distribution of the assets of the estate would be made. He fully complied with the court decree as to the payment of alimony for the support of the children. The court ordered that three-fourths of his share in his father's estate be paid to them, whereas he had previously assigned all of it for their use and benefit.

It appears that the mother of these children, who was a trained nurse, worked for awhile at Water Valley shortly after the defendant was paroled on October 25, 1950, where she had at least one of the children with her

while the little boy was with his maternal grandparents and the older girl was staying at the home of a cousin in Water Valley without any charge for board or lodging while she was attending school there; that after January 1, 1951, all three of the children were residing at the home of their maternal grandparents until after the death of their mother and until they were placed in the care and custody of the petitioners, Dr. and Mrs. Braund.

In answer to the complaint of the petitioners that the defendant did not visit his children after he obtained his parole on October 25, 1950, he invokes the provisions of the divorce decree, which awarded the custody of the children to their mother, and which provided that: "The defendant is to have the right to see the children at any reasonable time, but is not to visit the children at the home of the complainant's father." And the proof shows that she resided in the home of her father with the children at all times thereafter prior to her death, except during a short period while she worked at Water Valley as a registered nurse, and at a time when one or more of them were living in the home of her father. The latter testified that so far as he knew the defendant did not contribute anything to the support of the children during the time that they resided with him, whereas the defendant claims that he sent a check to Mrs. Mayfield for $250, which was never cleared through the bank and was never returned to him. His wife having died prior to the trial, his testimony in that regard was undisputed. He also testified at the trial that he undertook to talk to his wife over the telephone but that she would not talk to him; that he offered to send money, and that she declined the offer. His mother testified, and it is undisputed that while her son was in prison she sent both gifts and money to the children.

Moreover, the proof further discloses that immediately following his parole on October 25, 1950, he took up his abode in Greenville, Mississippi, at the home of Mr. and Mrs. J. T. Terman, in which city he was employed by Mr.

Terman. His earnings were meager and not more than sufficient for his own living expenses when he first began working as a parolee from the penitentiary.

At Greenville, he sustained an injury while at work and was confined to the hospital for a short time. While in the hospital he was visited by Rev. Garland Holloman, pastor of the Methodist Church. After leaving the hospital, the defendant went to see Rev. Holloman, discussed with him his past life and misconduct in Monroe County prior to being sentenced to the penitentiary, and expressed repentance on account thereof, and soon thereafter made a public profession of Christian faith and became a member of the Methodist Church. Rev. Holloman testified that the defendant was completely rehabilitated and was leading an upright Christian life. Mr. and Mrs. Terman in whose home the defendant resided also testified that he was a moral and upright man. The defendant met his present wife at church, began courting her sometime during the early part of 1951, and they were married on July 13, 1951, two days after the death of Mrs. Mayfield from whom he had been divorced, as aforesaid, but it is not shown that he knew of her death at the time he married his present wife, and according to all of the proof in the case, she is a good Christian woman.

It was shown that although his present wife, a registered nurse, was only twenty-one years of age at the time of the trial she had had experience in the rearing of her younger brothers and sisters, is very fond of children, and according to her testimony at the trial she is willing to have the care and custody of the three children here involved and to rear and train them in the proper manner.

The mother, sister and uncle of the defendant also testified that he is a changed man and is now living an exemplary life. While on the witness stand, the defendant stated to the court that "I come from good people. At times in years gone by I wandered from my training. I have seen the error of my ways. I was pretty rough. I

am sorry that I was. * * * I was named after my grandfather, he was a big church member, and my other grandfather was a Methodist minister. I know in times gone by I have not done right. I was a man, your Honor, that could not stand to take anything off of anybody. Any time I felt like I was mistreated I wanted to settle it. I have learned you cannot settle everything. I have moved completely away from all of my former troubles, all my political connections and political enemies and friends both. I don't want any politics. All I want is an honest chance to make an honest living and provide my children with a good home.''

Prior to the making of the foregoing statements by the defendant, he had been asked by the trial court as to why he had not obtained a pardon, and the fact that he could have been returned to the penitentiary by revocation of his parole was evidently a factor in determining what was to the best interest of the children. In an attempt to answer this inquiry from the court, it was shown that the prisoner had been listed by the Parole Board for recommendation to the Governor for a complete pardon but that the Chairman of the Board had to leave Jackson in answer to the process of a court and appear as a witness at this trial before the action of the Parole Board had been made official by being entered upon the minutes and signed. The Chairman of the Board stated over objection that the members thereof had unanimously voted on the afternoon before to make such a recommendation. It appears from a petition for a bill of review in this cause that a full and complete pardon was issued to the defendant only two days after the final decree of adoption was rendered. The refusal of the trial court to permit the filing of a bill of review is assigned as error on this appeal, but we do not reach that assignment in view of the decision that we have reached on the merits of the adoption proceeding.

On the question of his failure to visit the children, it was shown that under the express terms of the parole

issued to the defendant by the State Parole Board, he could not leave Washington County without the permission to do so from his Parole Officer. He was required to report to the County Welfare Agent of Washington County from time to time, who was, by virtue of her office, the probation officer of the county. It was shown without dispute that both the Chairman of the State Parole Board and the attorney for the defendant advised against his undertaking to visit the children during his parole, for fear that he might become involved in a controversy on account thereof.

Dr. Braund had testified that he would not have accepted any contributions from the defendant if offered for the support of the children after he took them into his own home at Memphis on September 1, 1951, where they remained until the trial on May 14, 1952, and where they still reside.

The defendant testified in the presence of his attorney that he had been advised by the latter not to try to visit the children while they were in the care and custody of their maternal grandparents and while they were in the care and custody of the Braunds. The defendant knew nothing about the standing and character of the Braunds until four or five weeks prior to the trial, and did not know what he might encounter if he should have undertaken to visit them. He learned four or five weeks prior to the trial that they were good people, and it appears in the record that the attorney of Dr. Braund had advised the attorney for the defendant that the latter could visit the children, but it was not shown that the defendant learned of this fact; but on the other hand it was shown by the testimony of the defendant without dispute that he acted on the advice of his attorney and the Chairman of the State Parole Board in not undertaking to visit the children either in the home of their maternal grandparents or at the home of the Braunds. Whether or not this advice was proper and expedient is beside the point. The fact remains that we are unable to say from the undis-

puted testimony that the defendant failed to show the proper attention to his children out of any spirit of indifference to their welfare, or that his action showed any intention on his part to abandon them, so far as his failure to visit them is concerned.

Complaint is made that his lack of regard for the welfare of his children and his indifference to them was shown by the fact that he did not remember them at Christmas time or on their birthdays which intervened during the period of his parole. However, the defendant's mother and sister testified that they went to Memphis and purchased Christmas gifts for the children, looked up the place of residence of the Braunds in the city directory, but that after they had purchased the gifts they were advised by the brother-in-law of the defendant's attorney that he said not to undertake to deliver the gifts. The mother of the defendant testified that at the request of the defendant she had made gifts to the children from time to time. Their maternal grandfather testified that *so far as he knew* no contributions for their support had ever been made.

After a most careful consideration of all of the testimony in the case, we are of the opinion that the proof is insufficient to show that he abandoned or deserted his children within the meaning of the previous decisions of this Court on that question, or is morally unfit to have them.

The petitioners, Dr. and Mrs. Braund, the appellees herein, rely upon Section 1269, Code of 1942; Amis on Divorce and Separation in Mississippi, Section 216; Am. Jur. Vol. 39, Parent and Child, Sections 26 and 27; and the following decisions of this Court in support of the decree of adoption, to wit: Eggleston, et al. v. Landrum, et ux, 210 Miss. 645, 50 So. 2d 364; Hibbette v. Baines, 78 Miss. 695, 29 So. 80, 51 L. R. A. 839; Dodson v. McElreath, 62 So. 2d 885; Wright v. Fitzgibbons, 198 Miss. 471, 21 So. 709; McAdams v. McFerron, 180 Miss. 644, 178 So. 333; McShan v. McShan, 56 Miss. 413; Fullilove

v. Banks, 62 Miss. 11; Morgan v. Shelly, 111 Miss. 868, 72 So. 700; Foster v. Foster, 6 How. 406; Cocke v. Hannum, 39 Miss. 423. But after a careful study of these texts and cases we are unable to find that any of them sustain the decision appealed from herein; that is the cases relied on are to be differentiated from the present case in that none of those cases involved an issue between the natural parent of a child and third persons where the natural parent, if unsuccessful in the case, was not shown to have either abandoned or deserted the child or was not shown to have been mentally or morally unfit to have the care and custody of the same.

On the other hand, in the case of Stegall v. Stegall, 151 Miss. 875, 119 So. 802, where the suit for custody of a child was between the paternal grandfather and the natural mother of the child, this Court held that clear proof of bad reputation of the mother, unsupported by proof of any act of immorality or misconduct or circumstances tending to show immorality or unchastity, was insufficient to establish immoral conduct on the part of the mother and to deprive her of the custody of her child, and the Court therein cited the case of Nickle v. Burnett, 122 Miss. 56, 84 So. 138, in which the Court said: "We think, as against all save the mother, the father has the supreme right to the control and custody of his child unless he has forfeited this right by immoral conduct, or by an abandonment of the child." The Court also cited therein the leading case of Hibbette v. Baines, 78 Miss. 721, 29 So. 80, and then said in the Nickle v. Burnett case that: "As against the mother, the paternal grandfather has no right, unless and until it is shown that the mother has forfeited her right to her child by abandonment, or by immoral conduct. It is presumed that the best interest of the child will be preserved by its remaining with its parents or parent until the well-recognized exceptions have been established. Kinnaird v. Lowery, 102 Miss. 559, 59 So. 843."

In Hibbette v. Baines, supra, the Court said: "It will be presumed to be to the best interest of the child to be with the father unless his unfitness or abandonment of the child be shown."

While it is true that any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child will import an abandonment, it is stated in 1 Am. Jur., Adoption of Children 643, Section 42, that "It does not follow that the purpose may not be repented of and, in proper cases, all parental rights again acquired, including that of preventing adoption by withholding consent, but when abandonment is shown to have existed, it becomes a judicial question whether it really has been terminated, or can be, consistently with the welfare of the child."

In Amis, Divorce and Separation in Mississippi, Section 212, page 287, it is said: "But human experience has demonstrated that as a general rule parental love and solicitude for its welfare is the best guaranty that it will be properly cared for, and trained for that station in life to which it was born and will likely be best fitted. So that in all such cases the court is met with the presumption that the child's parents will love it most and care for it most wisely, and as a consequence thereof that it will be for the real best interest of the child that it should be and remain in the custody of its parents. And in all contests between a parent and other persons this presumption is conclusive unless it be clearly shown that by reason of immoral conduct or vicious habits the parent is an unsuitable person to have the custody, or has forfeited the right to custody by reason of having abandoned it."

In 39 Am. Jur., Section 26, under Parent and Child, it is said: "Generally, ▮▮ a parent who, by reason of his misconduct, has been deprived of the custody of his child is entitled to have such custody restored, where he has re

formed and repented of his evil ways and is presently able suitably to provide for the child."

In the very recent case of Newman, et al. v. Young, .......... Miss. .........., 9 Adv. S. 53, 61 So. 2d 296, in a contest between the natural mother of a child and its paternal grandparents for its custody, the Court applied the rule that as between the natural parent and third persons that the test is whether the parent has abandoned the child or is morally unfit to have its care and custody, instead of what may have been to the best interest of the child.

██ Moreover, as hereinbefore stated, our adoption statute now in effect, Sec. 1269, Code 1942, has expressly withheld from the courts any authority to enter a decree of adoption of a child or children where either parent shall appear and object thereto before the making of a decree of adoption, as in the instant case, unless it shall be made to appear, from the evidence touching such matters, that the parent so objecting has either abandoned or deserted the child or is (not that he has been in times past) mentally or morally unfit to rear and train it; and the Legislature has thereby declared that *in either of such instances alone* shall the adoption be decreed notwithstanding the objection of such parent. If either of such conditions are shown to exist, the court may then adopt the child "first considering the welfare of the child or children sought to be adopted," that is to say the court may then, in such case, consider the welfare of the child or children to be adopted in determining whether or not the petitioners therefor shall be permitted to adopt.

In the instant case, the writer of this opinion could not be human and at the same time derive any pleasure in writing the same so as to deprive either the appellees or the appellant of the care and custody of these children, disturbing on the one hand the status quo now existing between these children and the appellees or on the other hand depriving their natural father of his legal right to their care and custody. The entire record discloses that the chancellor endeavored to honestly and conscientiously

protect what he conceived to be to the best interest of those whose future destiny was at stake. The children involved are the victims of the tragedy that occurred ten years ago which resulted in the separation of their natural father and mother and a broken home, but our statutes on the adoption of children and the previous decisions of this Court which prescribe the conditions alone under which a natural parent may forfeit the care and custody of his offspring have rendered it necessary, under the proof in this case, that we must reverse the decree appealed from and render a decree here in favor of the appellant.

Moreover, we are unable to say that the conditions prescribed by the statute for adoption and our previous decisions as to the right of a natural parent are unwise, since a decision adverse to the natural parent in a contest between such parent and third persons based solely on what may be to the best interest of the child, and in the absence of proof that the parent has abandoned or deserted the child or is mentally or morally unfit to have its care and custody, would become a precedent for permitting anyone to adopt the child of another on the ground that he is more able to give it the advantages that may be thought most desirable. Where both the natural parent and the third person or persons are worthy, and there has been no abandonment of the child by the natural parent, it would not be a safe precedent to deprive the natural parent of his child or children on the ground that the third person could supply to it more comforts and advantages than could be furnished by the natural parent.  ██ ██ A peculiar factual situation often renders it difficult to render a decision entirely free of injustice or hardship for some of those to be affected. We are often confronted with the disturbing truth that it is not within our power to administer equal and exact justice in every case; that we can administer justice only according to law.

Then, too, although not decisive of the question before us, the appellant in the instant case happens to be earning between $600 and $700 per month as a skilled steel worker, lives in a comfortable and adequate residence, and is able to properly support, maintain and train, for that station in life to which they were born and will likely be best fitted, the children here involved, even though his income is not as large nor his home as spacious, expensive or desirable as that of the appellees.

Reversed and judgment here for the appellant.

*Hall, Holmes, Arrington* and *Lotterhos, JJ.,* concur.

---

ON SUGGESTION OF ERROR

June 8, 1953          34 Adv. S. 135          65 So. 2d 235

ARRINGTON, J.

It is urged in the brief of the appellees on this suggestion of error that in view of the fact that in the former opinion herein this Court stated that the case had been tried in the court below on the wrong theory, and that, therefore, we should have reversed and remanded the cause for a new trial in order that it could be decided on the correct theory.

The contention of the appellees is based on the fact that it was stated in the former opinion that the trial judge made no affirmative finding in his written opinion rendered at the conclusion of all of the evidence to the effect that the appellant, James A. Mayfield, Jr., had either abandoned or deserted the children, or either of them, or is mentally or morally unfit to rear and train them. However, the former opinion went further and recognized that in the final decree the trial judge adjudicated that "the defendant, James A. Mayfield, Jr., has, because of his moral unfitness and because of his abandonment and desertion of the said minors, forfeited such right as he might otherwise have to their custody.

. . . '' We reversed the case and rendered a final judgment here for the reason that we were of the opinion that there was not sufficient evidence to sustain the above adjudication.

Except for the fact that the trial court did in its final decree make the adjudication last above quoted, there might be a good deal of merit in the contention that the case should be remanded in order that the trial court could make a finding of fact on the issue of abandonment or moral unfitness. But we think that the final decree is controlling as to what the trial court actually held, and that the issue on which the appellees asked for the case to be remanded for an adjudication has already been decided in the decree appealed from.

Suggestion of error overruled.

*McGehee, C. J.,* and *Hall, Holmes* and *Lotterhos, JJ.,* concur.