376 So.2d 1336 (1979)
Steve MILAM
v.
Deborah MILAM, Deceased, et al.
No. 51449.
Supreme Court of Mississippi.
November 7, 1979.
Rehearing Denied December 12, 1979.
*1337 Bramlett, Mounce & Soper, Paul Kent Bramlett, Tupelo, for appellant.
Gardner & McElroy, Thomas J. Gardner, III, Tupelo, for appellees.
Before ROBERTSON, P.J., and BROOM and COFER, JJ.
ROBERTSON, Presiding Justice, for the Court:
Appellant, Steve Milam, has appealed from a Decree of the Chancery Court of Lee County awarding "the exclusive care, custody and control" of his three-year-old daughter, Shonda Michelle Milam, to the child's stepfather, Guy Patterson, Jr. (the second husband of Deborah Milam Patterson, deceased). In its decree, the court further found Guy Patterson, Jr.:
"to be a fit and proper person to be appointed guardian of both the person and the estate of the said minor and upon proper petition filed in this Court will be appointed as such guardian."
After Deborah Milam Patterson (Shonda's natural mother) was killed in an automobile accident on April 7, 1978, Steve Milam filed a petition to modify the divorce decree of November 20, 1975, in which decree the court had awarded the permanent care, custody and control of Shonda Michelle (then 5 weeks of age) to Deborah Milam, the natural mother, and had provided that Steve Milam, the father, pay Deborah, the mother, $75.00 per month child support. In his petition for custody of Shonda, Steve also prayed for the issuance of a writ of habeas corpus to have Shonda returned to him.
Deborah Milam married Guy Patterson, Jr. on February 28, 1976, when Shonda was about 4 1/2 months old, and Shonda had lived with them in a house trailer (next to her maternal grandparents' home) until Deborah's death on April 7, 1978. In the automobile accident in which her mother was killed, Shonda suffered a broken left leg and was in a cast for about 2 months. While Shonda's leg was in a cast and up to August 1, 1978, Shonda lived with and was cared for by Charles Holcomb (maternal uncle) and his wife.
Holcomb filed an answer and cross-petition in which he averred that he had the physical custody of Shonda and prayed that he be appointed guardian ad litem and granted temporary custody of Shonda. Guy Patterson, Jr. also filed an answer and cross-petition. He averred that Milam had abandoned Shonda at her birth, was mentally and morally unfit to have her custody, that he, Guy Patterson, Jr., had had the sole responsibility for rearing and maintaining Shonda and prayed that he be awarded her care, custody and control.
Milam testified that he had paid the $75 monthly support until February 28, 1976, when Deborah and Patterson were married, but could produce a cancelled check for only one $75 payment. Steve further testified that he visited his daughter up to February 28, 1976, but had not visited her since because Deborah said it would cause trouble between her and her new husband if he tried to visit the child in their home. Steve stated that he visited Shonda every day of the four or five days that she was in the hospital.
Milam testified that he worked seven days a week hauling milk in a tank trailer from dairy farms to the milk processing plant. His hours of work were from 6:00 A.M. to 3:00 P.M. each day and he made about $26,000 a year. He lives with his grandmother and would leave Shonda with her during the day, and then would take charge of her when he got off from work each afternoon. Steve's mother lives across the road from his grandmother.
Patterson testified that Shonda would be with the Holcombs (the maternal grandparents) during the day and that he would pick her up each afternoon when he got off from work and would have her with him each night.
It is apparent to this Court, as it was to the trial court, that neither of these arrangements is ideal.
*1338 After a full hearing, the court awarded "the exclusive care, custody and control" of Shonda to her stepfather, Guy Patterson, Jr. In its opinion, the Court stated:
"It has been mentioned earlier, and I regard it as highly significant, that Steve Milam contributed nothing toward the support of his child from the period of February, 1976, until this date. By way of excuse he said merely that it would cause some turmoil among the Pattersons and that he was not getting to see the child, neither of which makes any impression that is acceptable to the Court.
"I find no fault in Steve Milam presently except for his failure and refusal to honor his obligation to support his youngster, an obligation that moreover had been enforced by this Court and which Court Order was likewise disregarded.
"Having for that period of time failed to provide support for the child, I would have some apprehension about his conduct should ever adverse situations develop in the future.
"At the same time, based upon the performance of Guy Patterson, Jr. in the past, I have confidence that he will continue to provide for the needs of this youngster."
Mississippi Code Annotated section 93-13-1 (1972) provides:
"The father and mother are the joint natural guardians of their minor children and are equally charged with their care, nurture, welfare and education, and the care and management of their estates. The father and mother shall have equal powers and rights, and neither parent has any right paramount to the right of the other concerning the custody of the minor or the control of the services or the earnings of such minor, or any other matter affecting the minor. If either father or mother die or be incapable of acting, the guardianship devolves upon the surviving parent. Neither parent shall forcibly take a child from the guardianship of the parent legally entitled to its custody. But if any father or mother be unsuitable to discharge the duties of guardianship, then the court, or chancellor in vacation, may appoint some suitable person, or having appointed the father or mother, may remove him or her if it appear that such person is unsuitable, and appoint a suitable person." (Emphasis added).
A case similar in many respects to the case at bar is Pace v. Barrett, et ux., 205 So.2d 647 (Miss. 1968). In that case, Mrs. Lynn Barrett Pace, the natural mother, filed suit to gain custody of Benjamin Orbie Barrett (her 5-year-old son), who was living with his paternal grandparents, Berlon Barrett and his wife, at the time Berlon Orbie Barrett (her former husband and father of the minor child) was killed in an automobile wreck on October 27, 1965. The mother had been granted a divorce from the father on September 18, 1962. She had not asked for custody of her minor son and the court, in the divorce decree, merely found that the child was living with the father, Berlon Orbie Barrett, and granted the mother the right of reasonable visitation so long as the minor child resided with the father.
On July 24, 1964, Mrs. Barrett Pace (the natural mother) had filed a petition for child custody and in her petition alleged that she and her husband (Pace) resided in Waukegan, Illinois, had a comfortable home, that her husband was steadily employed and could support petitioner and her children and could furnish them with all of their needs, as well as a proper and suitable home. Berlon Orbie Barrett, the father, filed an answer wherein he charged that the mother had voluntarily abandoned her child at the time they separated, and that he, the father, had reared the child with the help of his mother and father. The trial court on September 24, 1964, entered a decree finding:
"That the Petitioner has failed to sustain the allegations of her Petition and the same is hereby dismissed. The Court further finds as a fact that it is to the best interest of said minor child, Benjamin Orbie Barrett, that he remains in the care, custody and control of his father, Berlon Orbie Barrett." 205 So.2d at 648.
*1339 On May 26, 1966, the court entered a decree on the petition of January 11, 1966, of the mother, Mrs. Pace, denying her custody and granting custody to the paternal grandparents. In its decree, the court said:
"The court doth find and adjudicate as a fact that the said petitioner, Mrs. Lynn Barrett Pace, is not a fit and proper person at this time for the care and custody of the minor child, Benjamin Orbie Barrett, the said petitioner having at a prior time, abandoned said child." 205 So.2d at 648. (Emphasis added).
In reversing this decree and awarding custody to the natural mother, Mrs. Lynn Barrett Pace, this Court said:
"The court was in error in finding that the appellant had previously abandoned her child and that she was not a fit and proper person to have the custody of her child. The court, in its decree of September 24, 1964, the pertinent parts of which have been heretofore quoted in this opinion, did not find that the mother, the appellant here, had abandoned her child, neither did it find that she was not a fit and suitable person to have custody of her child.
.....
"The paternal grandparents have no right to the custody of their grandson, as against the mother, until they have charged and proved that she has forfeited her natural right to the custody of her minor son by abandonment or by immoral conduct, or other circumstances which clearly indicate that the best interest of the child will be served in the custody of another. Bunkley and Morse, Amis on Divorce and Separation in Mississippi, Section 8.01 (1957). The burden of proof is squarely on their shoulders and they have not met this burden in this case.
"In Stegall v. Stegall, 151 Miss. 875, 879-880, 119 So. 802, 803 (1929), this Court said:
"`Upon the death of the father, it is now well settled that the mother has the right to the custody of her child as against any other person who asserts a claim thereto, unless there has been an abandonment of the child, or the mother has forfeited her right by immoral conduct... .
.....
"`As against the mother, the paternal grandfather has no right, unless and until it is shown that the mother has forfeited her right to her child by abandonment, or by immoral conduct. It is presumed that the best interest of the child will be preserved by its remaining with its parents or parent until the well-recognized exceptions have been established.'
"Inasmuch as neither abandonment nor immoral conduct was proved against the mother, it was not up to her, the appellant, to prove that she had rehabilitated herself. The lower court was in error in placing this burden on her." 205 So.2d at 649.
In the case at bar, the court did not find that Steve Milam was an immoral or unfit person, nor did the court find that he had abandoned his child. In order to get custody of Shonda, the burden was on the appellee, Guy Patterson, Jr., to clearly prove that the natural father was mentally, morally or otherwise unfit, or that he had abandoned his minor daughter, Shonda. He did not meet this burden of proof, as is clearly shown in the opinion of the trial court itself.
Because of the provisions of section 93-13-1, and the decisions of this Court from Hibbette v. Baines, 78 Miss. 695, 29 So. 80 (1900), through Turner v. Turner, 331 So.2d 903 (Miss. 1976), consistently holding that a natural parent is entitled to the custody of his or her child unless it be clearly proved that the natural parent has abandoned his or her child or has forfeited his or her right to the child's custody by immoral conduct, the decree of the trial court awarding custody to the stepfather, Guy Patterson, Jr., is reversed, and the custody of Shonda Michelle Milam awarded to her natural father, Steve Milam.
This case was considered by a conference of the judges en banc.
REVERSED AND RENDERED.
*1340 PATTERSON, C.J., and SUGG, WALKER, BROOM, LEE, and BOWLING, JJ., concur.
SMITH, P.J., and COFER, J., dissent.
COFER, Justice, dissenting:
This case was considered in an en banc conference of the Judges. With their majority view, I am unable to agree, and am strongly constrained to dissent.
Appellant Steve Milam (Milam) and Deborah Holcomb Milam (mother) were husband and wife, but separated in April 1975, and divorce was granted to the mother on November 20, 1975. On October 9, 1975, there was a child born to the union (Shonda) whose custody was awarded to the mother. Rights of reasonable visitation were vested in Milam, who was also ordered to pay $75 per month, beginning on December 15, 1975, for Shonda's support, and was also required to carry her "on any health and medical insurance policy that he purchases." (All collateral matters pertaining to custody, support and property have been resolved as between the parties," the divorce decree says).
On February 28, 1976, the mother married Guy Patterson, Jr., who is one of the appellees.
The Mother and Shonda were involved in an accident on April 7, 1978, resulting in the mother's death and causing Shonda to suffer considerable injuries.
Milam, appellant here, thereupon filed a petition to modify the divorce decree to give him custody of the child, and also praying letters of guardianship of her estate and person, making also his petition one for habeas corpus. He made defendants the child's stepfather Patterson and her maternal uncle Charles Holcomb, "and any and all other persons claiming custody or exerting physical control over the minor child."
Holcomb answered the petition wherein he included a "cross petition for child's best interest," which best interest, according to the relief he prayed therein, would be served by his being appointed guardian ad litem to have the child's custody and to undertake, by contempt proceeding, to collect from Milam all back support owing by Milam and for the birth of the child, and the expenses of her hospitalization as a result of her injuries hereinabove mentioned and that these recoveries be placed in a court-controlled guardianship fund. Holcomb alleged that Milam had abandoned the child, had failed to provide food, shelter, or clothing for it, and had not provided adequate child support payments during the lifetime of the child or its mother.
Patterson, the stepfather, filed answer and cross bill, in the latter of which he prayed award of the child's custody and general letters of guardianship of the child's person and estate. He alleged that he, at all times, has occupied the position of the parent of the child, providing its entire support and maintenance, Milam contributing nothing thereto nor visiting or otherwise attending to her needs. He charged that Milam abandoned the child at her birth and has at no time cared for her, or visited with her, or maintained her in any way; that cross petitioner has had the sole responsibility for her rearing and maintenance; "that the acts of the petitioner, Steve Milam, constitute abandonment and by such abandonment the said petitioner has forfeited his right to the care, custody and control of the minor child."
After hearing on this triangular proceeding, the chancellor denied relief to appellant and to appellee Holcomb, and granted the prayer of appellee Patterson, Jr., the stepfather. From this result the father has appealed and assigns as error that:
The learned chancellor was erroneous in his findings of fact, interpretation of evidence and conclusions of law, in granting unto Guy Patterson, Jr. custody in this cause, and in denying unto Steve Milam full and complete custody, care and control of his daughter, Shonda Michelle Milam, and likewise in denying unto Steve Milam the right to serve as guardian of said minor child.
In concluding the cause as he did, the chancellor said, in his opinion:

*1341 I find no fault in Steve Milam presently except for his failure and refusal to honor his obligation to support his youngster, an obligation that moreover had been enforced by this court and which court order was likewise disregarded.
Having for that period of time failed to provide support for the child, I would have some apprehension about his conduct should ever adverse situations develop in the future.
The record reflects that documentary proof of only one child support payment could be produced, although appellant testified that he had made some other payments by check and had also made some cash payments. He was brought into court on a contempt charge, and, by some arrangement not appearing in the record, gave a check on or toward his default on which check he stopped payment, for some cause also not appearing of record. He claimed no payments after February 28, 1976. After February 1976, he did not visit with the child until her hospitalization. The proof is that he had seen the child some six or eight times in its life, but not at all from January or February 1976, until the April 1978 accident. At Easter, 1976, he bought her some clothing, but kept them when the mother would not permit a visit by the child, and still had the clothing and introduced it in the hearing. He never sent her customary Christmas, birthday, Valentine, or similar greetings, and the entire visits with her were a combination of no more than four hours in length. The record shows that when he visited her in the hospital she showed no signs of recognizing him.
He explained his failure to visit the child and comply with the court's support orders by testifying that his visits and payments only served to cause displeasure to exist between the mother and her husband Patterson, and they failed to agree on visitation. He did not reconcile this testimony with her citing him for contempt of court.
With the court's doors open, appellant could easily have sought and procured compulsory orders concerning visitation. We know that "reasonable visitation" frequently has to be clarified in cases such as this. The fact that he did not get to visit with the child as he thought reasonable was not an excuse for his failure in his duty of support, nor was it adequate to cast upon the mother and her husband the duty of financial support. Lide v. Lide, 201 Miss. 849, 30 So.2d 51 (1947).
Appellant's failure to visit and support the child does not impress me as being satisfactorily explained. Most parents of delightful little children will not relinquish to others the privilege of providing for them and will not forego the pleasure of visiting with and supporting their little ones on the flimsy pretense (not corroborated by anybody) that it was to keep tranquil relations between the mother and her successor husband.
The record supports the finding that financial hardship did not enter into his failure to pay.
The record reflects a newborn or revived interest in the child on appellant's part after the tragic occurrence above, which interest is commendable, if this interest is not inspired by the possible recovery of damages which may be had.
From the leading case of Hibbette v. Baines, 78 Miss. 695, 29 So. 80 (1900), it has been the steadfast rule in our jurisdiction that, as against collateral relatives and others, the natural parent has a paramount right to the custody of his or her child, the presumption being that the welfare of such child is best served by its being in the custody of the natural parent.
It is a common occurrence for trial judges and attorneys to become terrorized at the very mention of Hibbette v. Baines; for unfit parents to be awarded custody of children; and for children to be victimized and deprived, for their lives, of their best interest, because that case maintains the presumption that the best interest of the child is served by its being in the custody of its parents or one of them. This is all without the courts' scraping away of the surface rebuttable presumption and discovering that, beneath it, there is the teaching that *1342 the presumption is overcome by a showing of parental unfitness or parental abandonment of the child. Hibbette v. Baines needs proper application or none at all.
The stunning lack of interest on the part of Milam, as reviewed hereinabove, bears contrast to the father's display of interest in the Hibbette case:
From the wife's death, in 1889, until July, 1891, the father remitted monthly to Mrs. Armistead, for the children, twenty-five dollars. He failed in July, 1891, and sent for some months ten dollars. It is shown, we think clearly, that Mr. Baines sent checks covering three thousand dollars, after July, 1891, and that he has spent at least five thousand dollars from the death of his wife until the bringing of this suit on his children. There is an effort to show that the twenty-five dollars per month were dividends from stock it is alleged the father assigned to Mr. A.A. Armistead in trust for Rosa. This, if true, does not alter the fact that the father at last was the source of the bounty  the principal  and that he constantly remitted, which is the important thing in this inquiry. This included not merely these monthly remittances, but the payment of many accounts for his children for drugs, clothing, etc. He never allowed a birthday of either child to go by without remembrances sent, and often did the like on holidays. In addition to this, he made frequent, and sometimes valuable, contributions to the grandmother and aunts; and, indeed, the relations all around as evidenced by the letters in the record, were pleasant ones, up to the visit of appellee and his wife to Shreveport, during Christmas, 1898.
The present Mrs. Baines made some presents to the children, and she is shown by the testimony of two witnesses to have manifested for them affection and tenderness and a desire to promote their happiness. What does the record show as to the state of feeling between the father and his children? The father came from Birmingham to see his children several times every year, except for one interval of two years; and was visited by his children at his home in Birmingham; and there was a regular correspondence kept up between him and the aunts and the grandmother, and letters were also regularly written or messages sent for the children to their father. These letters and messages on the part of the children breathe the tenderest affection. They call him "Darling Pops" and anticipated his visits with greatest pleasure. On his part his letters show the deepest and most constant affection and solicitude. We do not think the expression on the part of these children of a preference to remain with their aunts, made in the court below to the judge, entitled, under all the circumstances of this case, to much consideration. The trial judge was in far better situation to judge as to this particular point, seeing and hearing the children themselves, than we are, reviewing the cold page unillumined by the manner and actions of the children at the time. (Emphasis added). (78 Miss. at 719-721, 29 So. at 87).
Any conduct on appellant's part evincing a settled purpose to forego all paternal duties and to relinquish all parental claims to the child will import an abandonment. Mayfield v. Braund, 217 Miss. 514, 533, 64 So.2d 713, 721 (1953); cited and followed in Litton v. Litton, 227 Miss. 569, 577, 86 So.2d 485, 488 (1956). I consider that the chancellor found abandonment, and agree therewith, and am of the view that the record clearly upholds the finding, and that, under the circumstances of the record, his opinion and decree are correct.
Litton, supra, and Mayfield, supra, however, on the subject of abandonment, are authority for the pronouncement that abandonment may be repented of and, in proper cases, all parental rights again acquired.
The activities of appellant since the accident may probably be indicative of an intention to overcome his prior obvious indifference and unconcern for the child. (In view of the monetary demands that are available to her, I find it significant that all three petitioners seek appointment as *1343 guardian of the child and her estate.) I think that he should have an opportunity to demonstrate the interest a parent should have for his own; to bring forth fruits, in other words, worthy of repentance. This may not be fully accomplished without visitation rights, and the final decree in this appeal awards to appellee Patterson exclusive custody of the child. I would modify the custody award so as to afford liberal visitation rights to appellant. Gatlin v. Gatlin, 248 Miss. 868, 161 So.2d 781 (1964). The support requirement of the earlier decree should remain or be applied again. As modified, I would affirm the lower court's decision and remand the cause so that those rights may be fixed by the chancellor.
Neither the father nor the stepfather can care for the child without help. Appellant, who works seven days a week, would, to supplement him, have relatives of his who are less acquainted with the child than he is. The stepfather would have maternal relatives to help him.
Disposition of the case in the above manner would keep the door open for changed circumstances which I would hope would come, warranting custody by the father.
SMITH, P.J., joins in this dissent.