PATTERSON, Chief Justice,
for the Court:
E. K. Arrington, Jr., and his wife, Judy Miller Arrington, filed a petition for the adoption of Bridgette Samone Miller, the daughter of Judy Miller Arrington and Hoyle Miller, in the Chancery Court of Lauderdale County. Hoyle Miller, the natural father of Bridgette Samone Miller, did not consent to the adoption but vigorously opposed it. From a decree granting the adoption, Hoyle Miller appeals and assigns as error the following:
1. The trial court erred in overruling the respondent’s motion to amend the bill of particulars;
2. The trial court erred in finding the respondent had abandoned the minor child.
Hoyle Miller and Judy Miller Arrington were formerly husband and wife and Bridgette Samone Miller was born to this union on February 10, 1972. The Millers were divorced on February 19, 1974, with the mother being permanently granted the exclusive care, custody and control of the minor now sought to be adopted. By the decree of divorce, Hoyle Miller, the natural father, was enjoined from “bothering or molesting” either Mrs. Miller or the child of the parties in any manner whatsoever.
We are unaware of the facts leading to the divorce but from that stated in Miller v. Miller, 323 So.2d 533 (Miss.1975), and some testimony in this record we ascertain that intense rivalry between the mother and father for the child began during its infancy. This is evidenced by a suit for separate maintenance, reconciliation, subsequent separation, and finally divorce. Sometime during this period the father removed the child to New Mexico without the consent or knowledge of the mother. This led to the child being returned to this state by the paternal grandmother at the request of the mother. Thereafter the child was again taken by the father which led to his arrest in Texas and the return of the child to its mother by the father’s sister.
This rivalry for the child has continued subsequent to the divorce as is evidenced by a long series of court battles instituted by the mother for child support payments. The father has never voluntarily made these payments but has only done so under the compulsion of contempt proceedings including periods of incarceration. Under these circumstances it cannot be stated that the father has conducted himself in an exemplary or even normal manner reflecting affection or love for his child. Whether this conduct was the result of the decree enjoining him from “bothering or molesting” either the mother or the child we do not know, but it does appear that such mandate in conjunction with the exclusive custody being granted the mother has been interpreted by both parties as denying the father any right of visitation with the child.
Mrs. Arrington, presently resides in the City of Meridian with her husband, a teenage daughter by a marriage prior to her marriage to Miller, and Bridgette, whose custody she obtained in the divorce proceedings from Miller. Mrs. Arrington’s attitude toward the father of Bridgette can best be portrayed, we think, by quoting from her testimony in part. After stating the father had never paid any support for the child unless compelled by court order and had never taken any legal proceedings to obtain visitation rights she stated that he had not seen the child since 1973, when Bridgette was one year old. Additionally she complained the father had never contributed anything to medical or dental bills of the daughter but admitted that she had never advised him of any illnesses though she could have done so. In response to questions:
Q. Now, you stated that Hoyle Miller hasn’t seen his child since 1973. Tell the Court why he hasn’t seen her.
A. He did not have any visiting privileges according to the Court and I was always fearful for the child.
*1177 Have you ever permitted him to see that child since that time? &
No, I haven’t. <1
And you had no intentions of ever permitting him to see the child? ©*
Not unless the Court tells me he has some visitation rights.
You would have no objection to him seeing the child if the Court told you he could have visitation rights? o*
It would depend on his behavior. >•
Mrs. Arrington, you have let his mother, Mrs. Cooper, see the child, have you not? «€>
Yes, I have. <<
But you first had the understanding with her that she was not to mention the name of her father. a*
We have never had an understanding that she was not supposed to mention his name, no. I guess it was something we assumed. We didn’t talk about it.
And you also had the understanding with her that she was not to permit Hoyle to see this child at any time she had her. o*
That’s right, and she told me that she wouldn’t do that.
[[Image here]]
Has Hoyle Miller called you on many occasions over these many years you have spoken about and asked you about his child? o*
He probably called two or three times a year up until I remarried and would always talk vulgar and threaten, he was always going to kill me or my folks or someone and I would hang up the phone, and I have told him that he had no visitation rights and he would have to go back to court. I even told him if he wanted to talk about it to call Mr. Bailey.
[[Image here]]
You are telling the Court that you never had any intention whatsoever of letting Hoyle Miller see the child. <3*
A. If Samone ever asked to see her dad and I thought she was old enough, that would be a different thing, but Samone has never asked.
[[Image here]]
Q. Well, now, explain to this Court, she has no relationship with her father, of course not. Now tell the Court why she hasn’t.
A. Because her father has not supported her. Her father has not contacted her on holidays or her birthday.
[[Image here]]
Q. How could he have a relationship with his child when he was not permitted to see or visit with her?
A. I think if he has wanted to see her bad enough he would have gone back to Court and I think he would have kept his child support current to the best of his ability.
[[Image here]]
Q. Mrs. Arrington, even as late as last Christmas, didn’t Peggy Denton, the sister of Hoyle Miller, call you and ask you to please permit Hoyle to see his child and that she would come with him?
A. Yes, she did call.
Q. And didn’t you tell her that you would have to think about it and talk it over with your husband?
A. That’s correct.
Q. And then the next day your husband called the mother and the sister of Hoyle Miller and told them that Hoyle could not see the child.
Q. [sic] We didn’t think it was a very good time, it was holidays, and we couldn’t see any reason to upset Sa-mone.
Q. Was there ever a good time?
A. Not really.
[[Image here]]
Q. Don’t you think he has a right to see his child?
A. Not really. (R. 132-136)
*1178 The trial court found that “the absolute failure of this father to pay any money over the long period of time constitutes abandonment and desertion,” stating
If ever I have seen an absolute and total legal abandonment of a child by a father, this has been it. The fact that he paid $3,000 on a six thousand dollar delinquency has no bearing on this Court’s decision. Had he paid child support through the years, he wouldn’t be where he is today, and he would have been seeing his child all these years more than likely, everything else being equal, but he made the situation, he created it, and he is the absolute and total cause of the actions that this Court feels it must take under the circumstances.
Whereupon the adoption was granted.
Miss.Code Ann. § 93-17-7 (Supp.1981), sets forth the criterion for termination of unfit parents’ rights. In pertinent part it provides:
No infant shall be adopted to any person if either parent, after having been summoned to sign the petition for adoption, shall appear and object thereto before the making of a decree for adoption, unless it shall be made to appear to the court from evidence touching such matters that the parent so objecting had abandoned or deserted such infant or is mentally, or morally, or otherwise unfit to rear and train it, including, but not limited to, being within any of the grounds requiring termination of parental rights as set forth in subsections (2) and 3(a), (b), (d) or (e) of section 93-15-103 in either of which cases the adoption may be decreed notwithstanding the objection of such parent, first considering the welfare of the child, or children, sought to be adopted.
The 1980 amendment of Miss.Code Ann. § 93-17-7 with its additional requirements for abandonment or desertion did not alter the previous requirement of the older statute, Miss.Code 1942 § 1269-03, concerning abandonment and desertion. The preceding statutes were merely supplemented by additional requirements. The earlier statutes had been held by this court to require, in an adoption proceeding, either abandonment or desertion of the child preliminary to granting an adoption. In Mayfield v. Braund, 217 Miss. 514, 64 So.2d 713 (1953), this Court stated:
It is therefore made clear that the court does not reach the issue of what is to the best welfare of the child or children sought to be adopted until it shall first appear from the evidence that the parent so objecting has abandoned or deserted the child or children, or is mentally or morally unfit to rear and train it or them, when the contest is between a natural parent and third persons.
We reiterated this premise in Ford v. Litton, 211 So.2d 871, 873 (Miss.1968), stating, “Before the best interests of the child are to be considered, the court must find that the parent objecting to the adoption has abandoned or deserted such infant, or is mentally or morally or otherwise unfit to rear and train it.” More recently, in the case of Yarber v. Dearman, 341 So.2d 108 (Miss.1977), we held that before passing on an adoption, the court must find abandonment or unfitness, moral or otherwise, on the part of the natural parent.
As indicated the appellant has not been an ideal father, but the record does not reveal that he is either mentally or morally unfit. Likewise, there is no evidence of abandonment, other than constant arrear-ages in child support payments, some of which were explained by his inability to pay following injuries in an automobile accident. Simply put there was no evidence that the father has evinced a settled purpose to forego all parental duties and relinquish all parental claims to the child. In the Matter of the Adoption of Hall v. Hall, 202 So.2d 641 (Miss.1967); Wright v. Fitzgibbons, 198 Miss. 471, 21 So.2d 709 (1945).
The circumstances portrayed by this record are unusual and regretable and possibly result from the arbitrary attitudes of both parents, but nevertheless the petitioners failed, in our opinion, to prove an abandonment of the child by the natural father. In view of this holding on the issue of aban *1179 donment, it is not necessary to address the question raised in appellant’s assignment of error concerning a bill of particulars directed to the suitability of Mr. Arrington as an adoptive parent.
REVERSED AND RENDERED.
SMITH and SUGG, P. JJ., and WALKER, BROOM, ROY NOBLE LEE, BOWLING, HAWKINS and DAN M. LEE, JJ., concur.