## Hendrix, et ux. *v.* Hendrix

No. 39813 December 12, 1955 83 So. 2d 805

*Stovall Lowrey,* Clarksdale, for appellants.

*Roberson, Luckett & Roberson,* Clarksdale, for appellee.

ETHRIDGE, J.

This is a child-custody case. Appellee, Mrs. G. C. Hendrix, filed in the Circuit Court of Coahoma County a petition for writ of habeas corpus to try the right to the custody of Martha Lucille Hendrix, who was seven years of age at the time of the trial. Appellee is the paternal grandmother of Martha. The defendants in the action, appellants here, are Martha's mother and father,

Ira and Addie B. Hendrix. The petition charged abandonment of the child by the parents. After hearing testimony, the circuit judge held that there had been a "legal abandonment" of their child by the appellants, and awarded custody to appellee, the paternal grandmother. Appellants contend that this decision is contrary to the law, and is not supported by any substantial evidence. With that we agree.

Ira and Addie Hendrix were married on September 15, 1945. Primarily because Addie had been previously married, appellee, Ira's mother, was strongly opposed to the marriage. Martha was born on December 20, 1947. At that time Ira was working for his stepfather, G. C. Hendrix, in the latter's garage. He and Addie were living near the G. C. Hendrix' home in Clarksdale in a small house which was formerly a service station. For a year or more after the baby's birth Addie was in bad health, had several minor operations, and received medical treatments once a week. Appellants testified that Martha lived with them in the small home referred to above for about a year until around December, 1948. But during that first year Martha spent a good bit of time with her grandmother, largely because of Addie's bad health, and also because Ira had considerable financial trouble resulting from inability to get and to keep a job. On the other hand, appellee and her husband testified that when Martha was two weeks old her son and daughter-in-law told appellee that they could not take care of the child, that they did not know how to do it, and that Ira could not work in the daytime and walk the floor all night; and that from time to time until July 1954, for a period of about six and one-half years, Martha lived continuously with appellee and her husband, and they supported and cared for her entirely. At any rate, whether appellee began taking care of Martha for most of the time two weeks or one year after her birth, the child was cared for by her grandmother to a substantial extent for several years.

During 1948 and apparently 1949, Addie was ill fairly regularly. Ira and his stepfather did not get along together, apparently because Ira did not like to work, so Mr. G. C. Hendrix fired him from his job at the garage. He worked at various odd jobs during 1948 and 1949, and had a hard time making a living or keeping a job. In 1949, Mr. and Mrs. G. C. Hendrix and Ira and Addie made an agreement, by which Mr. Hendrix borrowed money to build a small house on the back of the lot in Clarksdale, on which his residence was already situated, and Ira and Addie were to make the installment payments on that loan. When the loan was to be paid off, the little house on the back of the lot would belong to Ira and Addie. It was built in the latter part of 1949, and around that same time Addie went back to work for a former employer, the telephone company. She worked continuously at this job until July 1954. For the first part of it she had to be on a night shift, and later worked during the daytime.

Ira and Addie lived together in the little house on the back of the Hendrix' lot from the time it was built until Ira went into the army in June 1951. For a part of the time after the baby was born, until they moved into the little house, Ira and Addie, as well as Martha, lived in the home of Mr. and Mrs. G. C. Hendrix. After Ira entered the army in June 1951, Addie continued to work for the telephone company, to keep up the payments on the little house and on a car, and to live in the little house in the backyard of the G. C. Hendrix' home. Mrs. G. C. Hendrix kept Martha while Addie worked eight hours a day, and she also kept the child at night. Mrs. Hendrix said that Addie refused to care for Martha when she came from work, although she wanted Addie to do so.

On the other hand, appellants said that after they moved into the little house, appellee kept the child at night over their objection; that she had so spoiled Mar-

tha that she did not want to stay in the little house with her mother and father, later with her mother after Ira went into the service; and that appellee monopolized the child and tried to exclude Addie from any association with her. Appellants' attorney testified that while Ira was overseas Addie called him on the telephone on not less than fifteen occasions to tell him about various difficulties which she was having with appellee, with particular reference to the possessive attitude of appellee toward the child, and Addie asked him if appellee could take the baby away from her; that on his advice Addie wrote Ira a letter about the matter and it was determined to wait until he got home.

During Ira's absence in the army from June 1951 until July 1954, Addie lived in the small house, but she apparently ate many meals in the G. C. Hendrix' home and manifestly associated with them, although relations were not too cordial. Appellee's sister, Mrs. A. J. Miller of Memphis, testified that every one to four weeks during the three-year period Ira was away from Clarksdale, appellee, Addie and Martha would visit her at her home in Memphis over the weekend; that she also visited frequently at the Hendrix' home in Clarksdale and saw Addie there each time she came. However, she never did see Addie caring for the baby in its various physical needs.

Appellee testified that she and her husband bought all of the food and clothing for Martha up until July 1954, and provided for her medical and other needs. During Ira's absence from Clarksdale while in the army, Addie received a dependency allotment from him of $137 per month, and she was also making a salary at the telephone company. She said that out of this she bought practically all of Martha's clothes and helped to buy the food at the big house. Addie obviously was in the G. C. Hendrix' home quite often. One of the witnesses mentioned an occasion when she and Addie were washing dishes in the kitchen.

Ira returned from duty overseas in July 1954. His mother, together with his wife and child, met him in Memphis. He was assigned to the army post at Fort Sill, Oklahoma, so he made arrangements there for living quarters for his wife and child. Mr. G. C. Hendrix testified that he fed Addie, Martha and Ira (when he was not in the army) from the time they moved into the little house on his lot until they left for Fort Sill, and that he and his wife took care of them as one would naturally do for their children and grandchildren.

Ira and Addie went to the home of G. C. Hendrix to get Martha to take her to Fort Sill. According to the appellee's version, when she objected because the child did not want to go, Ira and Addie assaulted her and knocked her down, but did not take Martha that day. The next day Ira's attorney called appellee, and she agreed that appellants could take Martha with them to Fort Sill, which they did. Appellants testified that they did not hit appellee on the occasion stated, but Ira admitted that he slapped his mother, saying it was because she had made some untruthful statements about his wife. At any rate, appellants and Martha went to Fort Sill and stayed there from July until December of 1954. During this time appellee and her husband visited them on three different occasions; and they testified that the Fort Sill living quarters were unwholesome and very detrimental to the child's welfare, although this was denied by appellants.

Ira applied for service overseas and for permission to take his wife and child, and this was granted. So in December 1954 they returned to Clarksdale to pack their clothing and other things and to embark for Europe. At that time appellee filed his habeas corpus proceeding. After the judgment of the court was rendered awarding custody to appellee, appellants appealed with supersedeas, so apparently appellants have also had custody of Martha for the eleven months since the judgment of the trial court.

In this case the paternal grandmother is seeking to take the custody of a seven-year-old child away from her parents, the appellants. Appellants live and have always lived together since their marriage. For the six months prior to the trial of this action, the child was in their continuous and exclusive custody. These are unusually strong circumstances in favor of appellants, the parents. The question is whether taking the record as a whole and considering it in the light of the principles established in the cases, the trial judge was warranted in finding that, prior to the recent exclusive custody of Martha by appellants, the actions of appellants toward their child constituted an abandonment which would deprive them of their inherent right to her custody.

The leading case in Mississippi is Hibbette v. Baines, 78 Miss. 695, 29 So. 80 (1900). There the mother died leaving two children, one four months and the other three years of age. On her deathbed, with the consent of the husband, she gave their custody to her mother for life, and, after her death, the boy to one aunt and the girl to another aunt. The father, Baines, left the children with the grandmother for ten years, until her death. This suit was a contest between the father and the two aunts. During the intervening period he had moved to Birmingham, had sustained a considerable financial loss, and had gone into bankruptcy. Later he married a wealthy woman, and he and his wife desired custody of his children, who had been in the exclusive custody of the grandmother for ten years. For most of this time the father made monthly contributions to their support. He visited them several times each year. The court held that there was no abandonment which would deprive him of his right to custody of his children. A strong presumption exists that he, or the mother, as the case may be, can love them more and care for them more wisely than anyone else. The one who seeks to withhold custody against this natural and legal presumption

has the burden of showing clearly that the parent, the father in Hibbette v. Baines, has abandoned his child, "contributing nothing to its support, taking no interest in it, and permitting it to remain continuously in the custody of others, substituting such others in his own place so that they stand in loco parentis . . ."

Hibbette v. Baines was followed in Nickle v. Burnett, 122 Miss. 56, 84 So. 138 (1920). The mother of the little boy died when he was about five months old, and her mother and father, and the boy's aunt had custody of him by the father's wish and consent for about nine years. Several weeks before the suit was filed, the father forcibly took the child from the aunt. After the death of his wife, the father, remarried and continued until the death of the grandparents to leave the child with them and his aunt. But when the grandparents died, appellant advised appellee that he was going to take his child. The trial court found that he had not abandoned him, but held that it was to the best interest of the child that he remain with his aunt for another year, at which time a final hearing would be held. This decree was reversed on appeal. It was held that there was no showing of any abandonment, and that appellant left the child in the custody of the aunt and the grandparents because he "was prompted by feelings of consideration for the child and for the grandparents, and not prompted in any way by any lack of affection or consideration for the child." Stegall v. Stegall, 158 Miss. 875, 119 So. 802 (1928); Sinquefield v. Valentine, 159 Miss. 144, 132 So. 81 (1931); Bullard v. Welch, 171 Miss. 833, 158 So. 79 (1935); Ainsworth v. Boykin, 198 Miss. 756, 23 So. 2d 297 (1945); Payne v. Payne, 58 So. 2d 377 (Miss. 1952); Newman v. Young, 215 Miss. 467, 61 So. 2d 296 (1952); Mayfield v. Braund, 217 Miss. 514, 64 So. 2d 713, 65 So. 2d 235 (1953); cf. Walker v. Williams, 214 Miss. 34, 58 So. 2d 79 (1952).

McAdams v. McFerron, 180 Miss. 644, 178 So. 333 (1938), contains an apt summary of the two competing rules in child abandonment cases. There the court affirmed a finding of the trial court that an abandonment of the child by the father had occurred. The child's mother died, and the father moved to Memphis. He never evinced any affection for the child or contributed anything toward his support, so the court properly held that the father had abandoned him. The Court quoted from Amis, Divorce and Separation in Mississippi, Section 216, and stated the principle which we think is applicable to the present case: "But if a parent, out of regard for the feelings or affections of kindred, or for purposes of education or training, or for any other just and reasonable cause, permits or allows a child to remain in the custody of another person, under such circumstances as to show that he or she did not intend to sever the relation of parent and child, or to shirk or evade the duty of rearing and maintaining it, and was not callous or indifferent as to its welfare, then such conduct does not bar his or her right to reclaim its custody, even though during such time the affections of the child and the custodian for each other may have grown to be very great. In such a case the affections of the custodian can not outweigh the right of the parent; if otherwise suitable to have the custody."

39 Am. Jur., Parent and Child, Section 26, properly states that "loss or forfeiture of the parent's right of custody should not be decreed except for grave and sufficient reasons." The proof must be of a positive kind. Ibid., Section 27. It is necessary that the evidence shall show clearly an abandonment by the parents before there can be in law a forfeiture of this natural and legal right of custody. Walker v. Williams, supra. See 67 C.J.S., Parent and Child, Section 12, p. 660.

With these sound and established limitations upon the abandonment doctrine in mind, we think that

the evidence was insufficient to support an abandonment of Martha by her parents, and that in fact it negatives such a conclusion. The trial judge made no finding and there was no evidence to support a decision that appellants are unfit to have custody of the child. For the six months immediately preceding the filing of this suit, Martha had been in the exclusive care, custody and control of her mother and father. It is undisputed that she and they were happy and satisfied during this time. There is no substantial evidence to show that during this period of six months she was not well cared for. We have seen no child-custody cases like the present one, where the parents from whom the custody is sought to be taken have had the exclusive custody of the child for several months prior to the bringing of the suit, and have during that period adequately cared for the child. Although this fact alone is not controlling on the principal issue, it is of the considerable significance and relevancy on the ultimate question of whether appellants have forfeited their right to custody of their child by abandonment. It is very strong evidence that they have not done so, and that they have had no intention of abandoning their child.

Moreover, a reasonable appraisal of the evidence reflects that prior to July 1954 Martha was in the joint custody of her parents and her grandmother. Up until the time he went in the army, the father had considerable financial difficulties, and trouble in getting and keeping jobs. The mother for over a year after Martha's birth was ill a good bit of the time. The grandmother was manifestly anxious and willing to care for Martha, and appellants mistakenly agreed or acquiesced in appellee's doing so. For part of the period before the latter part of 1949, when appellants moved into the little house on the back of the Hendrix' lot, appellants, as well as Martha, lived with Mr. and Mrs. G. C. Hendrix. According to Mr. G. C. Hendrix, they ate most of

their meals there until July 1954. After they moved into the little house, they resided on the same lot close to appellee's home. Manifestly appellants were in and out of appellee's house daily.

While Ira was away in the army, Addie worked for the telephone company, and during her working hours it was not unusual for the grandmother next door to care for the child. Appellee bestowed upon Martha considerable affection and devotion, and Martha naturally and properly reciprocated. But apparently the child began to take the attitude that she would rather stay in her grandmother's home, rather than in the little house, and appellants erroneously acquiesced. For several years appellee, Martha, and her mother frequently visited together with appellee's sister in Memphis. The sister testified about one occasion, which no doubt was one of many, on which Addie was washing the dishes in the Hendrix' home.

Taking together all of the undisputed facts disclosed by the record, and analyzing them in context, it appears that appellee and her husband, and the appellants and their child, lived substantially as one family for most of the period in question. Some of the reasons for this was Ira's inability to get and hold jobs, his financial troubles, Addie's illness, and the fact that she was working full time both before and after Ira went into the army. And undoubtedly for some time appellants were not as interested in and solicitous of Martha as a mother and father should have been. But the fact remains that this group of closely related persons were living on the same lot in homes close to each other, and for a good part of the period were eating together at the same table, and were operating as a family unit, although perhaps not always a happy and agreeable one. The family relations of the parties were preserved and recognized, and Martha was still recognized as a child of appellants. This is particularly indicated by the fact that

appellee permitted appellants to take her to Fort Sill. During this period, and until Ira tried to move his family to Fort Sill, it was not contended that appellants had abandoned the child to the grandmother. As was said in McAdams v. McFerron, supra, the appellants, permitted and allowed Martha to remain in the custody of her grandmother, perhaps not out of regard for her feelings and affections but for causes reasonable to them at the time. Although such causes were of dubious weight, the circumstances show that appellants did not intend to sever the relation of parents and child, and that they were not callous or indifferent to her welfare.

Appellee concedes that appellants made small and minor contributions of money for Martha's needs, but claims that she furnished most of such economic help. But the fact that these people were living substantially together as a family, under the conditions outlined above, does not make wholly unreasonable the actions of appellants, although it was unwise and unfair to the child. For these reasons, even though the affections of the child and appellee for each other are great, this cannot outweigh the natural and legal rights of the parents, who are undisputedly suitable to have Martha's custody.

Appellee has failed to meet her burden of proof to clearly show by the evidence that appellants abandoned their child. An abandonment is not shown within the legal meaning of this term which would cause a forfeiture of appellants' right to Martha's custody. So the judgment of the circuit court is reversed, and judgment is rendered here for appellants, dismissing with prejudice appellee's petition for custody of Martha Lucille Hendrix. Her custody is awarded to her parents, the appellants.

Reversed and judgment rendered for appellants.

*Hall, Lee, Kyle* and *Gillespie,* JJ., Concur.